UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-CR-589 (RDM) |
| : | |
| JOSEPH IRWIN, : | |
| : | |
| : | |
| Defendant. : | |

**DEFENDANT'S MOTIONS *IN LIMINE*** 

Comes the Defendant, Joseph Irwin ("Defendant," or, in the alternative, "Mr. Irwin"), by counsel, and moves the Court to grant his Motions *in limine*. In light of the recently added charges in the second Superseding Indictment, Mr. Irwin reserves his right to supplement these motions to address the new charges and/or any new evidence or information learned between the filing of these motions and the currently scheduled trial date.

1. **Motion to Exclude Introduction of Marijuana and Firearms Found at the Defendant's Residence on the Date of his Arrest.**

Mr. Irwin was arrested, without incident, for the offenses in this matter on August 17, 2021. *See* FD-302, dated August 18, 2021, attached as **Ex. A.** On the same date, a search warrant was executed at Mr. Irwin's home which is located in Cecillia, Kentucky. *See* FD-302, dated August 19, 2021, attached as **Ex. B.** Agents seized items related to the charged offenses, including a phone, jacket, hat and flag pole that Mr. Irwin was purported to have used, wore and carried, respectively, on January 6, 2021. *Id.* In addition to these items, agents located two (2) marijuana smoking utensils, commonly known as bongs; four (4) jars with purported marijuana; and one snack baggie with purported marijuana in an armoire in Mr. Irwin's closet that he shares with his wife. *See* photos from search warrant attached as **Ex. C.** Agents also located two unloaded firearms in the master closet of Mr. Irwin's home: a glock handgun and an AR-15. *See* photos,

1

attached as **Ex. D.** Mr. Irwin legally owned these firearms and, resultantly, they were not seized by the agents.[1]

Mr. Irwin is charged with offenses occurring on January 6, 2021 in Washington, D.C. Neither the elements of the offenses nor the facts surrounding Mr. Irwin's involvement on January 6th involve the use or possession of marijuana or firearms. To be sure, there is no evidence that Mr. Irwin was using or possessing marijuana on January 6th, nor that he possessed a firearm on that date. Introduction of evidence of marijuana and firearm possession in August of 2021 in Kentucky—7 months after the offense in another state—is not (1) relevant to the offense pursuant to Federal Rules of Evidence ("FRE") 401; (2) FRE 404(b) evidence; nor (3) intrinsic evidence. Accordingly, evidence of the possession of these items should be excluded at trial. Each of these arguments will addressed in turn below.

Evidence is considered relevant when it (1) has a tendency to make a fact more or less probable than it would be without the evidence and (2) the fact is of consequence in determining the action. *See* FRE 401. At issue here is the second prong. The question the Court must ask for this prong is whether the evidence of the marijuana and firearm possession in Kentucky in August of 2021 is of consequence in determining whether Mr. Irwin committed the offenses of Obstructing an Official Proceeding; Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Disorderly Conduct in a Capitol Building; Parading, Demonstrating or Picketing in a Capitol Building; and/or Entering or Remaining on the Floor of Congress on January 6, 2021 in Washington, D.C. There is no evidence, nor is it alleged, that Mr. Irwin possessed or used marijuana on Capitol grounds or in the Capitol building or that he had a

---

[1] It should be noted that pursuant to the Court's Order for pre-trial release that the guns were transferred to a family friend's home so the firearms could be maintained in a secure gun safe.

2

firearm in his possession on January 6, 2021.  Thus, evidence of marijuana and gun possession found at his home in August of 2021 would not have any bearing on the outcome of the current charges.  That is, the fact that he had marijuana and two guns seven months after the offense does not help prove that he committed the present offenses.

Even if the court were to find some relevant value to this evidence, it is inadmissible pursuant to FRE 403.  This rule provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by the danger of…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FRE 403.  Introduction of the marijuana and gun possession evidence would unduly prejudice Mr. Irwin because it is propensity evidence.  Admission of propensity evidence poses a "risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment–[it, thus,] creates a prejudicial effect that outweighs ordinary relevance." *Old Chief v. U.S.,* 519 U.S. 172, 181 (1997), citing *U.S. v. Moccia,* 681 F.2d 61, 63 (C.A.1 1982). "The overriding policy of excluding such evidence...is the practical experience that its disallowance tends to prevent confusion of the issues, unfair surprise and undue prejudice." *Id.*  Allowing introduction of essentially criminal possession of marijuana would unduly prejudice Mr. Irwin because such conduct could insinuate to the jury that he has a propensity to commit violations of the law.  That is, because he committed another offense, he must have committed the offenses charged.  Likewise, introduction of evidence that Mr. Irwin possessed two firearms could insinuate to a jury that Mr. Irwin may have been armed on January 6th and lead them to improperly conclude his criminal intent that day.  And, with the new charges of Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon and Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon, a jury could be misled to believe that because Mr. Irwin has inherently dangerous weapons at home, he has a tendency to possess dangerous weapons at all times. Such prejudicial evidence is especially dangerous when there is no evidence that Mr. Irwin had a firearm with him on January 6th. Thus, evidence of the marijuana and firearm possession should not be admitted at trial.

The marijuana and firearm possession evidence also is inadmissible pursuant to FRE 404. First, FRE 404(b)(3) requires the government provide reasonable notice of its intent to offer 404 evidence at trial, articulating the purpose for which the government intends to offer the evidence and do so in writing in advance of trial. To date, the government has not provided such notice. For this reason, the evidence of marijuana and gun possession should not be admitted pursuant to FRE 404. Second, even if properly noticed, the evidence would only establish character evidence, is not probative and unfairly prejudicial and, thus, not admissible under this rule. FRE 404(b) prohibits the use of "other crimes, wrongs, or acts…to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FRE 404(b)(1). Other bad acts are permitted, however, as evidence of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FRE 404(b)(2). To determine admissibility under FRE 404(b), courts conduct a two-part analysis. *U.S. v. Miller,* 895 F.2d 1431, 1435-36 (D.C. Cir. 1990). First, the Court must consider whether the evidence proffered is "probative of a material issue other than character" and second, if the evidence meets this threshold, the Court must examine whether the probative value is "substantially outweighed" by a danger of unfair prejudice. *Miller,* 895 F.2d at 1435. For the same reasons as cited above, introduction of marijuana and gun possession has no probative value to the offenses charged and, therefore is not relevant; would only insinuate Mr. Irwin's purported character of illegally

4

consuming substances or possessing dangerous weapons; and, as a result, would be highly prejudicial. Thus, under the two-prong analysis, this evidence is inadmissible pursuant to FRE 404.

The U.S. may argue that FRE 404 is inapplicable because the marijuana and firearm possession is intrinsic to the current offenses. However, the D.C. Circuit has adopted a narrow understanding of what constitutes intrinsic evidence. Evidence is intrinsic if it "is of an act that is part of the charged offense" or "uncharged acts performed contemporaneously with the charged crime…if they facilitate the commission of the charged crime." *U.S. v. Bowie,* 232 F.3d 923 (D.C. Cir. 2000). As set forth in the arguments above, the marijuana and firearm possession 7 months later in another state are not acts that are part of the charged offense from January 6th, nor were the acts of possession performed contemporaneously with the charged crime such that they facilitated the commission of it. As to this latter issue it should be noted that there is no evidence that on January 6, 2021 Mr. Irwin possessed the same marijuana and firearms found in August of 2021. Accordingly, the possession of the marijuana and firearms are not intrinsic to the charged offenses and evidence of this should not be admitted at trial.

**2. Motion to Preclude Government's Usage of Certain Terms at Trial.**

Mr. Irwin moves to preclude the Government's use of the terms "rioter," "insurrectionist," "member of the mob," and/or "attacker"/participant of the attack on the Capitol" at trial to describe Mr. Irwin. Such terms are not probative, highly prejudicial and would lead to confusion for the jury.

Courts routinely preclude the use of certain terms at trial when parties or witnesses refer to a criminal defendant. *See U.S. v. Carr,* 2016 U.S. Dist. LEXIS 64822, *2 (D. Nev., May 16, 2016) (Court ruled that "referring to the defendants as 'gang' members…does not make any fact of

consequence more or less likely, and the danger of unfair prejudice flowing from the term 'gang' is great"); *U.S. v. O'Reilly,* 2009 WL 3837877, *1 (E.D. Mich., Nov. 17, 2009) (government precluded from using the term "gang" when introducing the defendant's statement about his association with a motorcycle club because it has a negative connotation); *U.S. v. Santiago,* 643 F.3d 1007, 1011 (7th Cir. 2011) (a jury may "associate gangs with 'criminal activity and deviant behavior,' such that the admission of gang evidence raises the specter of guilty by association or a verdict influenced by emotion"); *U.S. v. King,* 2022 WL 227242, *7 (D. Colo., Jan. 26, 2022)(Court granted unopposed motion to preclude use of term "terrorist" to describe defendant and cautioned the government to instruct its witnesses that "under no circumstances should they refer to the Defendant as a 'terrorist'…given the potentially extreme prejudice to Defendant"); and *U.S. v. Asuncion,* 2017 WL 11530425, *1 (E.D. Wash. Nov. 15, 2017)(government precluded from using the descriptor "violent offender" when referring to the defendant as it is "not relevant to the charge at hand and is likely to prejudice the jury").

A rioter, per the Cambridge Advanced Learner's Dictionary, is "one of a group of people who meet in a public place and behave in a noisy, violent and uncontrolled way, often as a protest." *Rioter, Cambridge Advanced Learner's Dictionary,* 4th Ed., 2013. An insurrection is defined as a violent uprising against an authority or government. *Insurrection, The Oxford Essential Dictionary of the U.S. Military,* 1st Ed., 2011. Thus, a insurrectionist would be a person participating in such a violent uprising. A mob is defined as "a large crowd of people, especially one that is disorderly and intent on causing trouble or violence." *Mob, Oxford Learner Dictionary,* 10th Ed., 2020. Attacker is defined as a person who uses violence to hurt someone. *Attacker, Cambridge Advanced Learner's Dictionary,* 4th Ed., 2013.

6

Here, there is no evidence that Mr. Irwin acted violently toward other protestors or officers. For example, there is no evidence that he hit, pushed, tussled/wrestled with, argued with, or acted in any aggressive way toward officers or other protestors on January 6th. In fact, the evidence is expected to show that Mr. Irwin de-escalated confrontations between other protestors and law enforcement. While there were members of the crowd on January 6th that were violent and physical, Mr. Irwin did not participate individually or in conjunction with others in those violent actions. To describe Mr. Irwin as a rioter, insurrectionist, attacker or that he was member of the crowd of violent actors would not only be an unfair, but incorrect. Such an inaccurate description would mislead the jury. Mr. Irwin is not charged with any acts of violence, thus, he should not be referred to as an individual who acts with violence. Further, such descriptors are irrelevant. The U.S. need not use these terms to present its evidence of the offenses charged.

Simply put, the anticipated terminology that may be used at trial is irrelevant and inflammatory. For these reasons, the United States should be precluded from using such terminology when referencing Mr. Irwin at trial.

**3. Motion to Preclude Witness Narration of Video and Documentary Evidence**

Mr. Irwin moves to preclude any government witness without personal knowledge or deemed an expert in the proper field from offering testimony in the form of a narration of events depicted on any video or photographic footage and/or from interpreting the meaning of the text of documents offered into evidence during either the Government's case-in-chief or rebuttal case.

From review of other trial testimony in January 6th cases, the government has used a witness without expert qualifications and/or personal knowledge to (1) read text of the U.S. Constitution and the U.S. Code and then provide testimony as to the meaning of and authority conveyed by each; and (2) narrate events depicted on video to describe the scene playing out on

screen. For example, in an August 2022 trial, Mark Gazelle, a Capitol Police officer with the Senate Chamber section, was asked to read aloud the Twelfth Amendment of the U.S. Constitution; 3 U.S.C. §15; and 3 U.S.C. §16 in the trial of *U.S. v. Erik Herrera,* 21-cr-619. He was then asked by the government if the U.S. Code "directs Congress to conduct the electoral certification that you described earlier that is to take place on January 6th, every four years," in addition to other follow up questions about what the Code relating to the electoral college process, such as "what does that mean, that the joint session would be dissolved?" *U.S. v. Erik Herrera,* 21-cr-619, transcript at 201:7—202:11. Officer Gazelle was not offered as or deemed a legal expert witness prior to providing such testimony. In the same trial, Officer Gazelle, who testified that he is usually inside or outside Senate Chambers, was asked to narrate a "compilation video showing the House and Senate galleries." *Id.* at 209:12-221:5. The government did not establish the location of Officer Gazelle in relation to the Senate when he is asked to describe the content of the compilation video and whether he personally witnessed the events on video to which he was testifying.[2] Additionally, the government had Officer Gazelle review footage of the Senate floor after he had evacuated the staff and was in another location of the building. *Id.* at 226:17-230:24. The prosecutor then asked the officer about the presence of protestors on the floor, what they were wearing, if they were carrying "flex cuffs," waving flags, and rifling through desks. *Id.* Further, the government had Officer Gazelle watch video from the House chambers and give a narration as to those events when it is clear that he was not present in that area of the Capitol building at any point on January 6th. *See Id.* at 223:1—226:17. As to the House portion of the video, Officer Gazelle was asked to describe what various officers were doing, if they were holding weapons in their hand and why they were doing so. *Id.*

---

[2] Video of the proceedings in the Senate appear to show Officer Gazelle entering the Senate just as it was adjourning at 2:13:45 p.m. His testimony in *Herrera* encompasses narration prior to his appearance on the Senate chamber/floor.

8

While there is no case law directly on point out of the D.C. Circuit, several other circuits, as well as state courts, have found that if a witness is not properly qualified as an expert, did not witness the depicted events while present at the scene of the crime, and lacks greater ability to understand items of evidence than does the jury, such person is not competent to testify to the contents/depictions of video evidence. *See U.S. v. Shabazz,* 564 F.3d 280, 287 (3rd Cir. 2009) (appellate court upheld trial court's limitation of co-defendant's narration of surveillance video to events only he witnessed, excluding him from discussing what occurred in portions of the video that depicted actions when his back was turned); *State v. Buie,* 671 S.E.2d 351, 354-55 (N.C. Ct. App. 2009)(Detective's simultaneous testimony interpreting the depictions on a surveillance video of crime was "inadmissible lay opinion testimony that invaded the province of the jury"); *Gonzales v. State,* 2006 WL 820387, *3 (Tex. App. Mar. 30, 2006) (expert in forensic video analysis improperly testified that a defendant was waiving a gun in gesture for a victim to "come this way" because he did not have special training in a field that qualified him to offer an expert opinion as to the defendant's intent, nor did the testimony assist the jury which was capable of determining the defendant's intent); *Robinson v. People,* 927 P.2d 381, 384 (Colo. 1996)("[A] lay witness may testify regarding the identity of a person depicted in a surveillance video if there was some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury").

The 6th Circuit has extended similar reasoning to photographic evidence. In *U.S. v. Dixon,* 413 F.3d 540, 545 (6th Cir. 2005), the district court prohibited identification testimony of the defendant in surveillance photographs which were to be offered by the defendant's son and two ex-wives. The court prohibited the testimony on the ground that their testimony would not assist

9

the jury in determining whether the individual depicted in the photograph was, in fact, the defendant. The Sixth Circuit upheld this finding:

> the district court found that the evidence failed to establish that either [the defendant's son or ex-wife] was familiar with [the defendant's] appearance at the specific time of the offense. The court also found that the evidence indicated that [the defendant] had not altered his appearance prior to trial. These factual findings are supported by the evidence and are not clearly erroneous. Moreover, our review of the surveillance photograph indicates that it was not of particularly poor or grainy quality, and it fully depicts the suspect's body from the waist up. Accordingly, the district court did not abuse its discretion in excluding the identification testimony of [the defendant's son and ex-wife] on the ground that it would not significantly aid the jury in determining whether the person in the surveillance photograph is [the defendant]. *Id.*

As to the issue of a government witness offering interpretation or meaning of a statute, this is equivalent to an expert providing their legal opinion at trial. The rule prohibiting experts from providing their legal opinions or conclusions is "so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle." Thomas Baker, "The Impropriety of Expert Witness Testimony on the Law," 40 *U. Kan. L.Rev.* 325, 352 (1992). In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law. *See Nieves–Villanueva v. Soto–Rivera,* 133 F.3d 92, 100 (1st Cir.1997) (excluding expert legal opinion "because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial"); *Weston v. Washington Metro. Area Transit Auth.,* 78 F.3d 682, 684 n. 4 (D.C.Cir.1996) ("An expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702"); *Snap–Drape, Inc. v. Comm'r of Internal Revenue,* 98 F.3d 194, 198 (5th Cir.1996) ("We have repeatedly held that this rule does not allow an expert to render conclusions of law"); *Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir.1995) ("To that end, [the expert's]

10

testimony was not a fact-based opinion, but a statement of legal conclusion. The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony"); *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994) ("We also believe this testimony was received in violation of the Federal Rules of Evidence.... It is the responsibility of the court, not testifying witnesses, to define legal terms. The expert's testimony in this regard invaded the province of the court."); *United States v. Leo,* 941 F.2d 181, 196 (3rd Cir.1991) (stating that "it is not permissible for a witness to testify as to the governing law"); *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir.1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."); and *Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 368 (4th Cir.1986) ("From beginning to end, it is obvious that Appellants proffered [the person] as an expert witness to testify in substantial part to the meaning and applicability of [law]. This flies squarely in the face of the precedent—and the logic of that precedent ....").

In this case, the government has multiple videos and still images of Mr. Irwin. These include CCTV (with no sound) from the Capitol building; a "selfie" video; and "selfie" and other photographs depicting Mr. Irwin on January 6, 2021. Narration by government witnesses who were not present when those videos and photos were captured are not qualified to give narratives of that evidence and should be precluded from doing so. Further, such narration of the video or photographic evidence will not "assist" the jury—they can watch the videos and view the photos and draw their own conclusions as to what they show as well as any agent called as a witness. Similarly, government witnesses—in particular federal agents—should be prohibited from reading aloud and interpreting the text of documentary exhibits about which they have no first-hand or expert knowledge. Moreover, without some additional foundation, there is no reason to believe that a government agent has the expertise or first-hand knowledge regarding the intent of the writer

11

or impact of the document on any reader. The exhibit is the evidence and any witness that interprets the meaning of any statutory text in those documents invades the province of the Court. The jurors should be allowed to form their own views on the meaning and weight to give any such exhibits without testimony about what the text means. Any meaning or interpretation of this evidence should be accomplished through instructions from the Court.

### 4. Defendant's Motion for Early Disclosure of *Jencks* Materials

Mr. Irwin moves this Honorable Court to order early disclosure of *Jencks* material prior to the trial of the above captioned matter, including but not limited to, any and all Grand Jury testimony in this matter; prior trial testimony in other January 6th cases; as well as, statements made by any witnesses and/or confidential informants. The undersigned has consulted with the government and has been advised that it will endeavor to produce the materials a week ahead of trial. Accordingly, Mr. Irwin requests that the materials be produced at least 7 days before trial in order to properly prepare his defense.

*Jencks* Act material should be provided to the defense pre-trial so as to provide the defendant with sufficient time to review and make use of the material in a meaningful manner. This is especially important in a case like the one at hand which involves voluminous discovery,[3] multiple witnesses, and travel by the defense.[4] Early disclosure of *Jencks* material will assist the defendant in achieving a fair trial and serve the public interest in expediting the fair resolution of criminal cases.

D.C. Courts have found that early disclosure of *Jencks* material is proper in certain

---

[3] Per the last global discovery production summary in this matter in December 2022, over 3.89 million files have been provided, which amount to "over nine terabytes of information and would take at least 361 days to view continuously."
[4] Due to travel, the defense will have limited resources available in D.C. which could hinder accessing, printing, and/or reviewing the *Jencks* materials if produced after travel or during trial. The defense anticipates traveling to D.C. 1-2 days prior to the start of trial.

circumstances:

> As Chief Judge Sentelle explained in *United States v. Marshall,* 132 F.3d 63, 67 (D.C.Cir.1998), not only does Rule 16 not immunize inculpatory evidence from disclosure, but such evidence "is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence. In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths."
>
> Thus, in a case such as this where, as Defendants correctly argue, the success of the Government's case will undoubtedly turn on the jury's assessment of the credibility of its four major witnesses, it is particularly important that the Defendants be given access to any inconsistent statements of those witnesses which constitute potential impeachment.
>
> For all these reasons, the Court concludes that Defendants are entitled to production of all *Brady/Giglio* materials, even if that material includes statements which are also covered by the *Jencks* Act…As the parties know, the trial judge has great discretion in setting deadlines such as these, and usually balances any potential dangers of early discovery against the Defendant's ability to use the materials effectively. In this case, the Court concludes that the interests of both the Defendants, as well as the Government, will be served by requiring the Government to disclose all *Brady/ Giglio* information …(10 days in advance of trial) and by requiring the Government to disclose *Jencks* Act statements…(five days in advance of trial).  *U.S. v. Daum,* 847 F. Supp.2d 18 (D.D.C. 2012)

Such practice is consistent with other circuits, as well.  As explained by the Court in *U.S. v. Minsky,* 963 F.2d 870, 876 (6th Cir. 1992):

> While technically the government may withhold Jenks Act material until the conclusion of the direct examination of witnesses, the better practice–and that followed in most federal courts today–is for the government to produce such material well in advance of trial so that defense counsel may have an adequate opportunity to examine that which is not in dispute and the court may examine the rest *in camera,* usually in chambers.  This avoids the inevitable delay of the trial when the material is withheld until the witness concludes his direct examination.

Accordingly, because the practice by most federal courts today is to order early production of the materials and the United States is in agreement to produce the materials early, it would be proper for the Court to order early disclosure in this matter.

/s/ Chastity R. Beyl
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, Kentucky 40202
(502) 584-0525


/s/ Aaron Dyke
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, Kentucky 40202
(502) 584-0525


Counsel for Defendant.


## CERTIFICATE

I hereby certify that on January 13, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the attorneys of record.