## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-589 (RDM)** |
| | : | |
| **JOSEPH IRWIN,** | : | |
| **JOHN JOSEPH RICHTER,** | : | |
| | : | |
| **Defendants.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Irwin to 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a $230 special assessment. As to John Joseph Richter, the government requests that the Court sentence him to 20 months of incarceration, 36 months of supervised release, $2,000 in restitution, and an $80 special assessment. These recommendations reflect an upward departure or variance from the top of the guidelines for each defendant as calculated by the government.

### I.    INTRODUCTION

Irwin and Richter ("Defendants") were among the very few rioters who breached the Senate Chamber during their participation in the January 6, 2021 attack on the United States Capitol. That violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential

election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

## II.    FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts accompanying the complaint filed in this case, ECF No. 1-1, for a brief summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  The Defendants' Role in the January 6, 2021 Attack on the Capitol

*Pre-January 6 Conduct: Defendants Discuss Politics, Election Fraud,*
*the Certification, and Contemplated Violence for January 6, 2021*

In November 2020, shortly after the media announced the results of the 2020 presidential election, the Defendants started regularly discussing those results and the intricacies of the election process in text message conversations. *See generally* Ex. 518. For example, the Defendants discussed technical issues, like the implication of the 25th Amendment, Ex. 518 at 120-126; Constitutional provisions and deadlines, *id*. at 432, 435; and political figures, *id.* at 221-222, 394, 521-55. They also frequently discussed lawsuits challenging the election results, *e.g.*, *id.* at 429, and facts surrounding what they perceived to be election fraud, *id*. at 252, Ex. 557, and alleged

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

fraudulent operation of voting machines, Ex. 518 at 329, 337. The theme of the Defendants' conversations was that, they believed, President-Elect Biden "cheated." Ex. 549.

In December 2020, after then-President Trump announced plans to hold the "Stop the Steal" rally in Washington, D.C. on January 6, the Defendants began mobilizing to attend. Richter posted a selfie-video on social media and said: "This isn't one of those things where we're going to say someone else is gonna do something. WE have to do it. It's OUR job. See you in D.C." Ex. 571. Irwin agreed, stating "If trump has called for it, we should plan that. If it's needed before, it's needed before." Ex. 518 at 477.

The Defendants also contemplated what they would do in D.C. on January 6. For example, Irwin said to Richter, "We can't just remove people, right? I mean we can, but we lack one thing. The next step. Organization. Organization on a large scale. If not us, then who? If not now, then when?" Ex. 518 at 390-391. Richter immediately responded, "If it's not us…it ain't happening. . . . Paul Revere is about to get on his horse. It's nearly time." *Id.*

Richter regularly posted threatening or menacing videos to his social media relating to the election. In one of these videos, Richter loaded bullets into the chamber of a handgun while he played election-related news videos in the corner of the video.



*Images 1 & 2: Screenshots from Ex. 570, which Richter posted online, where Richter is seen loading bullets into the barrel of a handgun while election-related news reels play in the top left corner of his video.*

Indeed, the Defendants often made violent remarks regarding the election. For example, in December 2020, Richter texted Irwin, "Apparently scotus needs to be scared of the right. Because they are scared of the left. So let's tip the scales of fear back to the middle shall we?" Ex. 518 at 474.

The Defendants analogized their planned actions on January 6th to the American Revolution. For example, in response to news about the planned "Stop the Steal" rally, Richter wrote: "He said. Be there. It's gonna be wild. This is the safest the president will ever be . . . This is as close to crossing the Delaware river on Christmas Eve as we are gonna get. Man, George Washington was a beast. 'Nam man. I know it's Christmas Eve, that's why we are crossing the river to kill them in their sleep now. They will never see it coming.'" Ex. 518 at 503-506.

The Defendants also discussed the violence they anticipated participating on January 6th. For example, in relation to the trip to D.C., Irwin texted Richter: "Are we go[in] open militia or innocent/ready bystander." Ex. 518 at 495. Richter replied, "Well I think we are gonna be in a

huge crowd mostly. So we will have to be opportunists most likely. Gnome sayin? I like the ready bystander wildcard approach myself." Ex. 518 at 496. And the Defendants chose the latter option.

To prepare as a "ready bystander," Richter assembled a large, "guidon"-like flagpole with metal tips, including a spear-like object at one end, to which he affixed a black American flag. Ex. 518 at 496, Ex. 568. Richter explained to Irwin that the "All black flag means no quarter[2] will be given. It's time to do patriot shit." Ex. 518 at 497. Irwin responded to Richter, "Bro. My stick is my flagpole." Then, in an ominous video sent to Irwin, Richter proudly displayed the flag/spear/guidon combination, stating, "It's ready boy!" Ex. 518 at 496, Ex. 568. Richter also posted on social media, "I'm bringing mine. Solid black. No quarter. This is their last warning."



*Image 3: Screenshot of video footage that Richter sent to Irwin of the flagpole and flag that he planned to bring to Washington, D.C.*

Irwin told Richter that he inscribed *his* wooden pole with a black American flag as well.

---

[2] No quarter means to offer "no pity or mercy" and is "used to say that an enemy, opponent, etc., is treated in a very harsh way." Merriam-Webster, *available at https://www.merriam-webster.com/dictionary/no%20quarter#:~:text=%3A%20no%20pity%20or%20mercy,no%20quarter%20to%20the%20enemy.*

In addition to bringing a flagpole with a "No Quarter" flag and a "heavy as fuck" black flag-inscribed pole, the Defendants discussed numerous other types of weapons and gear they would need for January 6. They said they needed "vests and white shirts" to match the 18th Century American revolutionaries, Ex. 518 at 482; they planned to bring full-face gas masks, *id*. at 498, Ex. 535; and they would bring gloves, battery banks, and goggles, Exs. 498, 499, 535; Trial Tr. at 124 (gas masks), 126 (goggles), 126-127 (Abel), 131-132.

As January 6 neared, the Defendants responded to then-President Trump's Tweet that said, in part, "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!," Richter stated, "Muster for liberty. Let's show these liberal soy boys what the sleeping giant looks like when it's up, angry, and ready to fight." He further stated, "Time to shine. We will be seeing you. Let's save America. #1776Again #comments #nohatespeech #wethefury #coven45 #hucksarmy." Ex. 518 at 508. And a few days prior to their travel, Irwin texted Richter: "Kind of feels like shit is going down." Ex. 518 at 564. Richter responded, "We are standing on the edge of American history. Joe, we going. We are going to be a part of it." On the same token, Richter texted Irwin "The patriots have already started taking DC," followed by "This is going to be legendary." Ex. 518 at 558; Trial Tr. at 132 (3/12/2024) (Irwin).

### January 6, 2021: The Defendants' Approach to the Capitol and Entry onto Restricted Grounds

The Defendants traveled to Washington, D.C. by car. They arrived for the rally on the morning of January 6, equipped with poles and backpacks, as planned. Trial Tr. at 277 (1/23/2024). Richter carried the flagpole with a black American flag and a pointed metal tip; Irwin carried his

black flag-inscribed heavy wooden pole. They carried their poles as they marched from the "Stop the Steal" rally towards the Capitol.



*Images 4 & 5: Screenshots of video footage showing Richter (red circle) & Irwin (yellow circle), left, marching towards the U.S Capitol carrying long wooden poles in hand and Richter's "no quarter" flag, right*

By 2:14 p.m., the Defendants had entered the restricted perimeter and joined the crowd on the west front. Irwin and Richter worked their way through thousands of people to get closer to the Capitol building, until they were stopped by the police line on the lower west plaza. Richter waved his "No Quarter" flag. Rioters near the Defendants attacked the police line, pulled on the bike rack barricades, threw weapons and objects at the officers, and attempted to break through the line.



*Images 6-9: Screenshots of video footage (Ex. 325 at 2:03) showing the Defendants' placement near the front of the crowd on the west front, as indicated by Richter's flag, just before officers are overrun and forced to retreat, top; and (Ex. 508, 131) showing the Defendants' selfie around the same time and area.*

**Irwin Violently Confronts Police and Smashes his Wooden Pole Into Two;
Richter Stands Alongside**

After making it to the front of the crowd, the Defendants bypassed the police line and climbed the stairs to the upper west terrace. Richter loudly banged the spear-like metal tip of his flagpole against the metal scaffolding, Ex. 434, and Irwin repeatedly banged his wooden pole into the ground as he marched, Ex. 322 at 2:28 p.m. The Defendants chanted "USA! USA! USA!" with the crowd as they marched closer to the Capitol building. When the Defendants reached the top of the stairs, they passed and ignored numerous fallen bike rack barricades on the ground and walked toward the Senate Wing Doors. *See* Ex. 434.

Around that same time, a group of Metropolitan Police Department (MPD) officers arrived at the Capitol building to assist the USCP. The officers moved to the upper west terrace and

temporarily halted behind the back side of the grandstands that were being assembled for inauguration to assemble their protective gear. Irwin and Richter approached the officers and Irwin started aggressively waving and jabbing his wooden pole in direction of the officers. Irwin belligerently yelled at the officers to "GO HOME!" Ex. 606. During his outburst, Irwin bent down as he faced the officers, raised his wooden pole in the air, and violently smashed it against the ground, causing the heavy wooden pole to crack into two pieces. Throughout this outburst, Richter stood closely behind Irwin, proudly displaying his "No Quarter" black flag.



*Images 10 & 11: Screenshots from body worn camera footage (Ex. 606, zoomed up) showing Irwin aggressively smashing his stick into the ground, top, and, after, screaming at police officers while holding the now-broken end of the stick, bottom.*

### *The Defendants' Illegal Entry Into the U.S. Capitol Building*
### *And Onto the Floor of the Senate Chamber*

After Irwin smashed his pole on the ground, he and Richter walked back towards the two

nearby entry points to the Capitol building on the upper west terrace. Richter removed the black

flag and dissembled the flagpole into two parts, then re-armed Irwin with one half of the flagpole—

an approximately four-foot piece with a metal point at the end. Ex. 901, 412. With both Defendants

now armed with halves of the metal-tipped flagpole, they watched as other rioters attempted to

break through the Senate Wing Door. As this happened, the Defendants chanted, "LET US IN!

LET US IN! LET US IN!" and banged their poles on the ground.



*Images 12 & 13: Screenshot from video footage (Ex. 408) and 3D rendering of the Capitol showing Richter (red circle) and Irwin (yellow circle) outside the Senate Wing Doors (on restricted grounds), each wielding poles with pointed metal tips, while rioters attempted to break through doors and windows.*

As some rioters worked to break through the Senate Wing Door, others worked to breach

the nearby Parliamentarian's Door. Richter and Irwin watched and took photos of both scenes.

Exs. 412, 510. When a rioter successfully breached the Parliamentarian's Door, Irwin and Richter

rushed towards the door. As Irwin approached that door, the smashed pieces of his wooden pole stuck out of his backpack with a sharp, spiked end facing up.



*Images 14 & 15: Screenshots of video footage (Ex. 412) showing Irwin (yellow rectangle) near the Parliamentarian Door with the sharp tip of his smashed pole (white outline) exposed.*

Notably, <u>no one</u> pushed or shoved Irwin, he entered of his own will. *Compare* Ex. 513 at 8 (Irwin's interview with the FBI where he falsely claimed he was pushed forward through the door). As Irwin entered, the building was loud. Sirens were blaring, rioters were screaming, and one rioter used a metal stand to bash an office door as Irwin watched.

As Irwin quickly maneuvered his way through the crowd and moved deeper into the Capitol building. Richter followed closely behind. After he was inside, Richter joined the crowd in yelling, and he repeatedly banged his flagpole on the ground.

As Richter and Irwin marched down the hall with the mass of rioters, they were stopped by a thin line of officers attempting to keep the growing crowd out of the building. Exs 401, 421, 423. The rioters chanted and yelled, banged flagpoles and other objects on the ground, and demanded access to the building. *Id.*; Ex 404, 410, 430.



*Images 16 & 17: Screenshots of Capitol Police surveillance footage (Ex. 313 (CCTV)) showing Richter (red markings) after he entered the Parliamentarian Door's and shouted with the crowd.*



*Images 18 & 19: Screenshots of video footage (Ex. 400 series) showing Irwin (yellow marking) joining chants with the rioters as they faced off with police officers guarding the Capitol.*

One rioter attempted to charge forward and breach the line, and officers captured and attempted to detain him. *See United States v. Rumson*, 23-cr-00070 (CJN).



*Image 20: Screenshot of video footage (Ex. 423 and 421) showing Irwin (yellow square) watching as police officers attempt to hold the crowd back.*

The crowd quickly charged forward and overran the police line. Rioters then moved down the hallway and turned a corner into another hallway. Ex. 315. USCP Sergeant Cohen testified at trial that, at this time, the "group of rioters kind of pinned" a small group of officers "in the corner of one hallway." Trial Tr. at 89 (1/22/2024); *id.* at 91 (describing the officers as outnumbered at this point). Irwin took a photograph depicting this dangerous situation, seeming to either mock the officers or to assert his dominance over them:



*Image 21: Selfie-style photo (Ex. 423 and 421) showing Irwin next to the officers that were "pinned" in the corner by the crowd.*

13

Ex. 509; *see* Trial Tr. at 90 (1/22/2024) (Sergeant Cohen was shown this photograph and identified this as the group of officers who were "pinned" by the rioters, including Irwin); Trial Tr. at 150 ((3/12/2024) (Irwin testifying, "Eventually, I got in front of police officers . . . .").

As the rioters turned the corner and continued deeper in the building, they chanted, "WHOSE HOUSE? OUR HOUSE!" and "STOP THE STEAL!" Exs. 401, 410, 423, 421; Trial Tr. at 146 (3/12/2024) (Irwin agreeing that he chanted and banged his pole on the ground in this hallway). The hallway at this juncture was "incredibly loud" and members of the crowd were "[s]houting, yelling, banging sticks and poles on the ground, if they had them [and] yelling and swearing at officers." Trial Tr. at 90-91 (1/22/2024) (Sgt. Cohen). When the members of the crowd banged their poles on the ground, the officers found it to be "absolutely" threatening, because they had "already seen the poles and things like that used as weapons outside and projectiles[,] so [they] were concerned about . . . being attacked further." Trial Tr. at 92 (1/22/2024).

Halfway down the second hallway, the crowd was stopped by another line of officers. The officers in this hallway were "try[ing] to take the building back and get [the crowd] out as fast as possible," but the crowd resisted them, trying "to get further into the Capitol." Trial Tr. at 92 (1/22/2024). As the rioters reached this next line of officers, they faced another decision point. Trial Exs. 401, 315. To the rioters' right, officers held a police line guarding a hallway that led into the center of the Capitol building. To the rioters' front, officers held a police line guarding a hallway that led to steps that go directly to the Senate Chamber. To the rioters' left, there was a short hallway that opened to the North Door and led to the outside. The officers attempted to persuade rioters to exit the Capitol building out of the North Door, Trial Tr. at 94 (1/22/2024), but the crowd, including Irwin and Richter, refused, *id.* (officers were instructing rioters to "leave, to

get out; pointing them in the direction of the doors"); Ex. 401 (showing Irwin and Richter). At this

point, the crowd was "angry, . . . loud, and antagonistic towards" the police officers. *Id.*



*Image 22: Screenshot of Capitol Surveillance footage showing the crowd confronting the last line of officers between the crowd and the stairs to the Senate Floor.*

The crowd shouted at, banged flagpoles, and aggressively confronted officers and, eventually, "became too much" for the outnumbered officers to handle. Trial Tr. at 96 (1/22/2024). As one rioter stepped forward, "it was like a dam burst and everyone else flooded through down the hall" that led directly to the Senate Chamber. *Id.* at 97; *see* Trial Tr. at 152 (3/12/2024) (Irwin acknowledging he was in the crowd that overtook several lines of officers).

The Defendants charged forward and climbed the same staircase that the Vice President had recently descended as part of an emergency evacuation. Trial Exs. 420, 312. As they marched up the stairs, Irwin yelled, "It's our building now! It's our building now! It's our building again!" Ex. 910 at :00-:28. Once on the second floor, Irwin yelled and continued to bang his pole on the ground.

The Defendants entered the Senate Chamber carrying their metal-tipped wooden poles. USCP Technician Robishaw testified that the Senate Floor is a "sacred place" in the Capitol building. Trial Tr. at 236 (1/23/2024).



*Image 23: Screenshot of Capitol Surveillance footage showing Irwin and Richter entering the Senate Chamber, metal-tipped poles in hand.*

Technician Robishaw, the sole police officer in the chamber for much of the time it was occupied by the mob, recognized that several rioters on the Senate Floor carried weapons, such as poles, which he viewed as threatening. Trial Tr. at 210-212 (1/23/2024). The rioters flooded the chamber, yelling and screaming, and going through the Senators' desks, documents, and belongings. Trial Tr. at 213-215 (1/23/2024). Irwin immediately approached the front of the room – at the Senate Dais – where the Vice President had recently presided over the Senate during the joint certification of the electoral college vote. Trial Tr. 5/3/23 at 194.

Irwin banged his flagpole on the ground and recorded a menacing video. He yelled, "THIS IS OURS RIGHT HERE! THIS IS OUR HOUSE! THIS IS WHAT THE COURT DO WHEN THE COURT TAKE IT! DON'T GIVE IT BACK TO THEM NOW!" Ex. 505.



*Image 24: Screenshot of selfie video (Ex. 505) showing Irwin belligerently screaming from the Senate Dais with his pole in hand.*

Officer Robishaw testified that Irwin's conduct riled up other rioters in the Senate Chamber. Trial Tr. at 226 (1/23/2024). After Irwin's display, another rioter approached the dais. Irwin and Richter bowed their heads and joined a "prayer." The prayer was made, in part, to "send a message to all the tyrants, the communists, and the globalists, that this is our nation, not theirs, and that we will not allow the America, the American way of the United States of America to go down!" Ex. 424. The Defendants celebrated in awe of this declaration. Ex. 426.1.



*Images 25 & 26: Screenshot of video footage showing Irwin and Richter "praying," top, and immediately celebrating when the "prayer" ended, bottom.*

Irwin and Richter sat at Senators' desks and had their photograph taken by a fellow rioter while brandishing their poles. Ex. 501; Trial Tr. at 241 (1/23/2024). After, they turned and gave each other a "fist bump."



*Images 27 & 28: Screenshot from Capitol surveillance footage (Ex. 305, top) showing the Defendants celebrating on the Senate Floor and a selfie of the Defendants (Ex. 507, bottom)*

Officers arrived on the scene, they immediately cleared the rioters out of the chamber. The Defendants were among the last rioters to exit. Ex. 303; Trial Tr. at 243 (1/23/2024).

Even after exiting the building, the Defendants were still celebrating their successes. They raised their firsts in celebration, slammed the metal tips of their flag poles into the ground, and chanted. Irwin then screamed, "THIS IS OUR FUCKING HOUSE!" Ex. 432.



*Images 29 & 30: Screenshots of video footage (Ex. 432) where Irwin (yellow circle) is heard chanting "THIS IS OUR FUCKING HOUSE" and Richter (red circle) is seen celebrating with a raised fist.*

### The Defendants' Post-January 6 Conduct

**Prideful text messages:** Late in the day on January 6, Irwin sent his wife a photo text message depicting him without "Abel" but with the other half of Richter's flagpole; his wife responded, "What stick is that?" Ex. 522 at 12. Irwin responded, "Abel is done. Abel broke. It was like that." *Id.* at 13.

Following January 6, the Defendants continued sharing prideful messages about that day, including about Irwin's smashed stick. For example, Irwin put one of the smashed pieces of his wooden pole on display in a shadow box and sent a picture to Richter. Ex. 579. When Irwin texted Richter the below photo, Richter responded on January 8, 2021, "Relic."  Ex. 518 at 595. Irwin replied, "Indeed." Ex. 518 at 595.



*Image 31: Photograph (Ex. 579) from Irwin's cell phone showing a display case that he created
for half of his smashed wooden stick, "Able."*

Irwin then sent his mother the same photo text, this time labeling it, "History." Ex. 521 at

3. After his mother responded, "Wow. The way the flag holder looks on this shadow box is

beautiful." Irwin followed up with, "A relic." *Id.* at 4.

On February 1, 2021, Irwin texted Richter about the smashed pole: "I need another stick."

Ex. 518 at 628. Richter responded, "Yes. Yes you do. Able was disabled." Ex. 518 at 628.[3]

---

[3] As discussed further below, these text messages decisively establish obstruction by both
Defendants. Despite that these texts show that both Defendants remembered how Irwin's wooden
stick became "disabled" on January 6, during the FBI's investigation, agents asked both
Defendants about what had happened to the stick. Both Defendants lied to the FBI agents, stating
they did not remember or did not know what happened to "Able." Ex. 513, 514, 515.

Moreover, the Defendants boldly lied again to this Court at trial when they sought a mid-trial
continuance by stating they both had "forgotten" about the stick-smashing altercation, only after
they were confronted with evidence of the altercation that they did not realize existed. Because the
evidence was so damning, these Defendants attempted to blame their choice to lie to the FBI on
their purported memory issues and related medical diagnoses from their time in the military. But
the argument failed. Although Irwin's lawyer argued that Irwin's PTSD can cause "holes in his
memory," Trial Tr. at 66 (5/14/2024), and Irwin's "expert" testified that Irwin likely "forgot" about
the pole smashing incident, that conflicts with Irwin's statement to the FBI. Until trial (when he
was caught in a lie), Irwin never claimed to have a "hole" in his memory; quite the opposite, Irwin
told the FBI that he "*clearly* remember[ed]" what happened with the pole.

Even five months later, the prideful texts continued. In June 2021, Irwin texted the following to Richter: "Never let them undermine or confuse the impact Patriots had on Jan 6. Sure, plenty of bad actors. They didn't get a million bad actors to show up though. That, sir, was a movement. A proud AF movement, rinse and repeat if they fuck around . . . They made me question shit for half a second. Fuck them. Riot on." Ex. 518 at 784.

Richter responded as follows: "No nets, no ropes, no harnesses. If we fell, we'd only be caught by the ground. We didn't do it because it was safe and controlled. The Patriots did what they had to do. Good luck putting the giant back to bed." Ex. 518 at 784.

**Text messages demonstrating a plan to cover up their criminal activity:** On January 8, 2021, Irwin sent Richter a link to an article entitled, "Police release photos of Trump mob members wanted for storming the Capitol." With that link, Irwin said the following: "Remember our plan." Ex. 518 at 597. Richter responded with an emoji, then Irwin again repeated, "Remember the plan." *Id.* at 598. Richter then responded, "Yes. You too." *Id.*

Likewise, when additional news articles emerged with photos depicting Irwin at the Capitol, Irwin's wife sent him one such article in a text message. He responded as follows: "That might be me . . . But I need you to know that you can't tell ANYONE that's me. No social media. Nothing[.]" Ex. 522 at 15-17. On January 8, after sharing with his wife the same link he shared with Richter, above, Irwin stated, "Shit." *Id.* at 21. His wife responded, "Fuck." *Id.* at 22. He then responded, "We need to make plans. Today." *Id.* at 23. His wife responded, "What kind of plans? I mean I thought if they come for you then you will have to go through the trial like you said." *Id.* at 23. Irwin replied, "Worst case scenario plans." *Id.* at 24. He then continued: "Remove all my

pics from Facebook. Or delete [your] account. Like, now. I would prefer you delete. Not deactivate. Delete." *Id.*

**Dishonest Interviews with the FBI:** Both Defendants agreed to be interviewed by the FBI following January 6. On August 17, 2021, Irwin was interviewed by Special Agent Joshua Powers, who testified at trial. As discussed further below, Irwin was deceitful, disingenuous, and outright lied to Special Agent Powers throughout the course of the interview, particularly regarding his violent outburst towards MPD officers on the Upper West Terrace, where he violently smashed his wooden stick, "Abel," while belligerently yelling at the officers to go home. Likewise, Richter was interviewed by the FBI in September 2022 and March 2023. The March 2023 interview was recorded. In it, Richter, like Irwin, lied to the FBI about his knowledge of what happened to "Abel."

*Irwin's Trial Testimony*

At trial, Irwin testified in his defense. During his testimony, Irwin claimed to have solid memories of facts that he believed helped him (such as remembering that he read a specific text message at a specific time period on January 6), but claimed not to have memories of events that placed him in an unfavorable light (such as violently smashing the pole into the ground). He otherwise testified inconsistently with his FBI interview.

Irwin also attempted to downplay the severity of his planning for January 6. For example, rather than accept responsibility for brandishing his wooden pole at the officers and smashing it in a threatening manner, Irwin claimed he was simply pointing the pole, not making any threatening actions.  Trial Tr. at 142 (3/12/2024) (Irwin). And despite dozens of text messages sent over the course of a month discussing the Defendants' preparation for January 6—including plans to bring a heavy pole, full-face gas masks, gloves, goggles, and other tools—Irwin claimed all of his planning statements were "jokes." Trial Tr. at 121 (3/12/2024). When Irwin was shown text

messages and photographs that *he sent*, he pretended that he did not know what was being asked. For example, Irwin testified that he did not know what "no quarter given" means, despite the Defendants' conversations about this (conversations noted above). Trial Tr. at 129-130 (3/12/2024) (Irwin). Or, when shown his text messages asking if him and Richter should go "open militia" with a picture of revolutionaries, Irwin claimed he "jokingly" sent a photo of "men in white shirts." Trial Tr. at 122 (3/12/2024); *see also id.* at 123 (Irwin characterizing all discussion about "1776" as "jokes").

Irwin tried to explain his text messages in a different light, but none of his explanations made sense. Irwin sent a text that said, "We can't just remove people, right? I mean, we can, but we lack one thing, the next step, organization. Organization on a large scale. If not us, then who? If not now, then when?" Richter responded with, "Paul Revere is about to get on his horse it is nearly time." Yet when confronted with these messages on cross examination, Irwin testified that his reference to "remov[ing] people," meant "through voting." Trial Tr. at 133 (3/12/2024). And Irwin doubled down on these lies. In the next text thread, Richter sent a text that said the Supreme Court needed to "be scared" and the people should "tip the scales of fear back to the middle." Trial Tr. at 134-135 (3/12/2024) (Irwin). Irwin again testified that "tipping *the scales of fear*" was a reference to "voting"—not violence.

Irwin also contradicted himself between his direct and cross examination. For example, Irwin testified on direct examination that he *asked* Richter for half of Richter's flagpole after Irwin smashed Abel, Trial Tr. at 102 (3/12/2024) (testifying that, when Richter had handed him the pole, it was because he "had asked John to break down the stick" for him). But on cross examination, Irwin claimed he could not remember how or why he got the pole, Trial Tr. at 143-144 (3/12/24) ("I don't know if I asked him for a replacement or he just saw that I didn't have my stick in my

hand and offered a replacement."). He explained this inconsistency by offering that "sometimes I try to fill in the blanks to be helpful," *i.e.*, sometimes he lies, even if he doesn't know or want others to know the answer. Trial Tr. at 143-44 (3/12/2024).

Irwin's testimony also was repeatedly inconsistent with video evidence. For example, Irwin testified on cross examination "I never saw a police barrier from my perspective that I crossed until I went in the building," Trial Tr. at 147 (3/12/2024), even though video evidence plainly showed downed barriers that Irwin walked past, Ex. 434. Irwin testified that he did not see any property destruction at the Capitol, Trial Tr. at 148 (3/12/2024), despite video evidence showing Defendants watching as a rioter smash the windows of the Parliamentarian's Door.[4] Exs. 414, 415. Moreover, Irwin took a photograph of the destruction. Ex. 510. During his FBI interview, he said he saw a man "busting out a window." Ex. 513 at 8; Trial Tr. at 148 (3/12/2024).

Irwin also testified inconsistently between his trial testimony and his statements to the FBI. For example, to the FBI, Irwin told the agents that he was "pushed" up the stairs into the Capitol, but when confronted with this on cross examination, Irwin admitted that was not true. *Compare* Trial Tr. at 149-150, 153 (3/12/2024) (Question: "You didn't get pushed into the Capitol building, did you?" Answer: "no, ma'am.") *with* Ex. 513 at 8-9, 12 ("I'm getting pushed forward" and "I was like, but I've got a thousand people behind me, like I can't go backwards, like I'm, I'm pushed right here. I can't move." and "I've already been pushed into the building." and "I get pushed in by a thousand people."). Irwin also told the FBI he was "pushed up the stairs" towards the Senate floor, Ex. 513 at 28, when the video evidence shows Irwin marching up the stairs on his own

---

[4] This was just another of Irwin's lies. He claimed not to remember this incident at all, but he had a photo of the incident on his phone. Trial Tr. at 186 (3/12/2024); Ex. 510. On cross examination, Irwin admitted he saw a man "tapping on the metal" but still maintained he did not see property destruction. Trial Tr. at 189 (3/12/2024).

accord while yelling, "It's our building now! It's our building now! It's our building again!" Ex. 910 at :00-:28.

Irwin claimed that he could not remember any of his aggravating conduct during his testimony. For example, he testified that he did not remember hearing the crowd loudly screaming "LET US IN!" outside Senate Wing Doors, Trial Tr. at 145 (3/12/2024), even though he was chanting and banging his pole along with the crowd. Ex. 408. Irwin testified that he did not remember having a Twitter account or a Parler account, yet he was confronted with both on cross examination. Trial Tr. at 165 (3/12/2024). Irwin testified that he called Abel a "relic" not because he was proud of his actions, but because he was drunk. But when confronted with the time of the text message (in the morning), he tried to walk that excuse back, too. Trial Tr. at 21 (3/13/2024) (Irwin).

And most unbelievable of all, during his FBI interview, when asked about the broken pole, Irwin provided an unequivocal, detailed statement of what he said that he "clearly remember[ed]." Ex. 513 at 23. Irwin told the FBI: "I clearly remember that pole on the way up on the left hand side was snapped." But when confronted with conflicting video evidence at trial, Irwin's story changed from "I clearly remember" to "I have a hole in my memory about that event." That claim is more incredible given Richter's identical late claim that he, apparently, had the same such hole in memory, a claim that (a) was likewise inconsistent with Richter's statement to the FBI, and (2) also came to light only after the video evidence was shown at trial, thus uncovering his lie to the FBI.

Irwin's lies about the pole don't stop there. When interviewed by the FBI, Irwin told the FBI that Abel "ended up getting lost" and that he was "actually disappointed." Trial Tr. at 10-11 (3/13/2024) (Irwin). But that is not what happened. The evidence showed that Irwin kept Abel as a "relic" in a shadow box in his daily living space. Irwin blames his inconsistent testimony on

confusion; but he doesn't, and can't, explain the confusion, Trial Tr. at 11 (3/13/2024) (agreeing what he said "was inaccurate"), particularly when confronted with not one, not two, but three separate text chains where he acknowledged that "Abel" had been broken on January 6.

And while Irwin repeatedly testified that he was in a state of anxiety or distress from PTSD while on Capitol grounds, the evidence—namely, all the selfies Irwin took on January 6—tell a different story:



*Images 32-37:  Selfies that Irwin took on January 6, smiling and enjoying his participation in the siege of the Capitol.*

## III.    THE CHARGES AND TRIAL

On January 11, 2023, a federal grand jury returned a second superseding indictment charging Joseph Irwin and John Richter with six counts each:

1. Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2 (Count One (both))

2. Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Two (Irwin) / Count Three (Richter))

3. Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Four (Irwin) / Count Five (Richter))

4. Entering and Remaining on a Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Six (both))

5. Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven (both)); and

6. Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eight (both)).

On May 14, 2024, following a bench trial, this Court convicted Irwin of all six offenses, while Richter of all six offenses, but not the enhancements under subsection (b)(1)(A) on Counts Three and Five.

However, following the Supreme Court's decision *in Fischer v. United States*. *Fischer*, 144 S. Ct. 2176 (2024), the government moved to vacate the defendants' convictions on Count One, which the Court granted on November 25, 2024.

## IV.    STATUTORY PENALTIES

The Defendants now face a sentencing on the remaining five counts of the Second Superseding Indictment. As noted by the Presentence Report issued by the U.S. Probation Office. The maximum penalties are laid out in Irwin's PSR ¶¶ 145-64, 151-53, 158-60, and 168-71, and Richter's PSR ¶¶ 157-58, 163-66, 172-74, and 182-87.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The appropriate guideline analysis for each count is listed below:

**Irwin's Guidelines Calculation:**

Count Two: 18 U.S.C. § 1752(a)(1), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Special Offense Characteristic | |
| | (Restricted Grounds or Building) | +2 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **10** |

Count Four: 18 U.S.C. § 1752(a)(2), (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2B2.3(b)(2) | Dangerous Weapon | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **14** |

Counts Six, Seven, and Eight: Class B misdemeanors which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**Total Offense Level:**                                                      **14**

**Richter's Guidelines Calculation:**

Count Three: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | (Special Offense Characteristic | |
| | Restricted Grounds or Building) | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **8** |

Count Five: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **12** |

Counts Six, Seven, and Eight: Class B misdemeanors which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

**Total Adjusted Offense Level:**                                              **12**

**Zero Point Offender:** Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria, including that the "defendant did not use violence or credible threats of violence in connection with the offense." Section 4C1.1 does not apply in this case, because Irwin and Richter used violence, or at a minimum, their conduct constituted a credible threat of violence against police officers on January 6 on several occasions.

First, the Defendants were armed with thick wooden, metal-tipped poles throughout their time on restricted Capitol grounds. When the Defendants marched to the upper west terrace, Irwin and Richter initiated a confrontation with police officers when they walked towards the officers. Irwin screamed at police officers and violently bashed his thick wooden pole on the ground in front of the officers in a threatening and aggressive manner, and with Richter wielding a "No Quarters Given" flag by Irwin's side in support. A reasonable police officer in this position would see this conduct as constituting violent conduct, or as a threat of violence. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (explaining that violence is "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm" while credible threat of violence is "a believable expression of an intention to use physical force to inflict harm.").

Second, after Irwin and Richter breached the Capitol building, they carried their poles that Richter had supplied throughout the Capitol building. As discussed above, the Defendants helped pin officers in a corner, banged their poles on the ground in a manner threatening violence, and joined the group that overran the police line near the North Appointment Desk. *See, e.g.*, Trial Tr. at 89 (1/22/2024) (Sgt. Cohen); *id.* at 91 (describing the officers as outnumbered at this point); Ex.

509; Trial Tr. at 152 (3/12/2024) (Irwin acknowledging he was in the crowd that overtook several lines of officers); *id.* at 149 (Irwin acknowledging that he should not have been in the Capitol building when he was "up against the police officer" in the Brumidi corridor); *e.g.*, Exs. 410, 509 (showing Irwin and Richter carrying poles in the Brumidi corridor). Each of these actions, independently, preclude the application of § 4C1.1 here. *See United States v. Kelly*, 21-cr-708 (RCL), Resent. Tr. (12/10/24) (Judge Lamberth declining to apply § 4C1.1 to the defendant's guidelines calculation (in a misdemeanor only sentencing, where the defendant was in the same group of rioters as Irwin and Richter, which forced their way past several lines of police officers in the Brumidi corridor and at the North Appointment Desk, and ultimately gained access to the Senate Floor as a result); *United States v. Carnell*, 23-cr-139 (Sentencing 12/13/24) (Judge Howell declining to apply § 4C1.1 to the defendant's guidelines calculation (in a misdemeanor only sentencing) where Carnell raised his fists and momentarily pushed against the backs of other rioters who were ultimately forcing open the East Rotunda Doors from the inside as the USCP were trying to keep those doors shut).

Third, when Irwin and Richter entered the Senate Floor they continued to threaten violence. Irwin hoisted his pole in the air as he screamed a threatening message and Richter banged his on the ground; both Defendants were aggressive, and, thus, the use of poles at this time undoubtedly threatened violence to the sole officer protecting that room. *See also* Trial Tr. at 210-11 (1/23/2024) (Tech. Robishaw testified that rioters with weapons—specifically on the Senate Floor—were perceived as more threatening: "I viewed [it] as a threat . . . . the ones that I saw inside the chamber were . . . like, sticks and flagpoles . . . you know, could be definitely used as a weapon.").

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the

government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[5]

**Obstruction of Justice**

**Irwin:** United States Sentencing Guidelines § 3C1.1 applies to all counts because both Irwin and Richter "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct or (B) a closely related offense."

This enhancement applies to Irwin for three independent and sufficient reasons: (1) Irwin lied to the FBI during the investigation; (2) Irwin disposed of the clothes that he wore on January 6 to obstruct investigators' ability to find or identify him; and (3) Irwin repeatedly lied under oath at trial. Therefore, § 3C1.1 applies to Irwin.

First, when the FBI interviewed Irwin in August 2021, he lied to the FBI several times, thereby impeding and obstructing the FBI's investigation and prosecution. Irwin told the FBI that he went to the Capitol alone and that he did not know or meet any one at the Capitol (other than a reporter he recognized). Ex. 513 at 13-14. He later admitted that was a lie in an effort to protect his friend and co-defendant Richter. This significantly delayed the FBI's investigation. During cross examination, Irwin admitted that:

- "I made a choice to not be forthcoming to the FBI. That was an unfortunate decision on my part." Trial Tr. at 170 (3/12/2024) (Irwin).

---

[5] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that, for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

- "I was not truthful with the FBI when I said that Mr. Richter did not come with me – I agree with that." *Id.* at 171.
- Question: "you lied about who you got [the pole] from, correct?" Irwin: "I did." *Id.*

Irwin also lied to the FBI when he told them that he got rid of the flagpole, "Abel." As a result, the FBI never recovered this piece of evidence, even though the trial evidence shown at trial demonstrated that Abel is still within Irwin's possession, sitting in a shadow/trophy box in a place of prominence in his living room. And as discussed above, Irwin lied about how Abel broke. When an FBI agent asked, "How'd it get broken?," Irwin responded, "When I was walking I was kind of stomping it on the ground and it snapped in half and then once it snapped, I was trying to walk with it and it ended up getting lost, I'm actually disappointed." Ex. 513 at 21.

The evidence presented at trial showed this version of events was false. Moreover, because of Irwin's false and misleading statements made to the FBI early in the case, the *actual* conduct—that is, Irwin violently bashing the stick—did not come to light until trial. Irwin intentionally misdirected the government in his unequivocally false recitation of the facts and significantly impeded and obstructed the investigation and prosecution in this case—by, for example, necessitating a lengthy mid-trial continuance.[6]

Second, Irwin intentionally deleted and destroyed evidence. He instructed his sister to "trash" or get rid of the clothes he wore on January 6, 2021, Trial Tr. at 8-9 (3/13/2024) (Irwin). He also successfully instructed his family members to delete evidence of him from social media. Trial Tr. at 9 (3/13/2024) (Irwin).

---

[6] The Court should reject any attempt by Irwin to characterize this statement as a matter of confusion. The transcript of the interview is clear. Ex. 513 at 21-25. Moreover, Irwin stated, "I clearly remember" the pole breaking. That Irwin now claims he has no memory of it breaking, when before he unequivocally stated that he had a clear memory, only underscores the extent of Irwin's lies.

Third, as explained above, Irwin repeatedly lied under oath at trial. He gave conflicting testimony between his direct and cross examinations, he gave conflicting testimony between his FBI interview and his trial testimony, and he gave conflicting testimony between his trial testimony and the video exhibits.

Each of these reasons constitutes a sufficient basis to apply § 3C1.1 to Irwin.

**Richter:** This enhancement also applies to Richter, who lied about material facts to the FBI during the investigation, which ultimately impeded and obstructed the investigation and prosecution of this case. During his interview with the FBI, Richter recounted the day's events in great detail in nearly all respects, yet he stated he "didn't know" how Irwin's stick had been broken. Richter conceded that, if the broken stick had been his, the breaking would have been intentional. This statement is illuminating; as the Court knows, the stick *was* broken intentionally—Richter just didn't want to tell the truth to the FBI. It also shows Richter's consciousness of guilt in re-arming Irwin by acknowledging the seriousness of the stick-smashing incident, all the while lying to the FBI about his knowledge regarding how the stick became broken.

Yet the video evidence is clear: Richter not only stood next to Irwin as Irwin smashed and broke his heavy wooden stick: ***Richter watched it break.*** And this explains why Richter later sent Irwin a text message calling Abel a "relic" after January 6; if Richter did not know how Abel broke, as he told the FBI, his text message in response to a photo of Abel in a shadow box would make little sense. Thus, the evidence showed that the Defendants concocted a "plan" following January 6 to lie to the FBI about this violent incident, which they both carried out.

Richter's lie materially impeded the investigation. Had Richter not lied—had he explained that Irwin smashed Abel in the face of police officers behind the grandstands while yelling at the officers to "GO HOME!"—the course of the investigation would have been different. The

government would more than likely have identified the video of this threatening and violent conduct much earlier, which would have avoided the midtrial motion for a mistrial after defense counsel delivered opening arguments that were plainly inconsistent with video evidence, and the lengthy midtrial continuance and resource intensive expert discovery period (to permit the defendants an opportunity to recast their lies) would also have been avoided. In turn, taxpayers' dollars would not have been wasted in the expert discovery and the continuance pursuit (by the federal defenders' office, the prosecution office, and by the Court). Additionally, because of this late-discovered information, the government did not have these facts when making charging decisions.

### **Grouping**

As to both Defendants, under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. The Section 1752 counts comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress. Under U.S.S.G. § 3D1.3(a), the offense level for a group of closely related counts is the highest offense level of the counts in each group.

For Irwin, the offense level for the group is 14. *See* U.S.S.G. § 3D1.3.

For Richter, the offense level for the group is 12. *See* U.S.S.G. § 3D1.3.

### **Criminal History Category:**

The U.S. Probation Office calculated Irwin's criminal history as category I, which the government does not dispute. Draft PSR ¶ 65.

The U.S. Probation Office calculated Richter's criminal history as category I, which the government does not dispute. Draft PSR ¶ 65.

### Guidelines

Based on the government's calculation of Irwin's total adjusted offense level of 14, Irwin's Guidelines imprisonment range is 15 to 21 months of imprisonment.

Based on the government's calculation of Richter's total adjusted offense level of 12, Richter's Guidelines imprisonment range is 10 to 16 months of imprisonment.

**A. An Upward Departure or Variance is Appropriate for Both Defendants.**

After determining the Defendants' Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the Defendants' Guidelines range does not capture the unprecedented and uniquely harmful nature of Irwin and Richter's crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Following *Fischer*, the government moved to vacate the Defendants' convictions under Count One, but that vacatur does not eliminate the severity of the Defendants' crimes. Indeed, nothing in the *Fischer* opinion prevents this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence, particularly in a scenario, like here, where the crucial fact of the Defendants' participation in the disruption of the proceeding at the heart of our country's democracy is not taken into account in their Guidelines calculation. Irwin and Richter joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses. Their offenses targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Irwin and Richter "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v.*

*Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024).

Nothing in the Defendants' revised Guidelines calculation reflects their intent to obstruct the certification proceeding during their extended time in the Capitol and on the Senate floor; an act which puts them in a very small and extremely disruptive set of January 6 defendants. Defendants would face the same offense level if their crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[7] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. A sentence within each of the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Indeed, as one judge explained:

> [G]oing in the Senate Chamber where most Senate staff don't even have privileges to be because it is such an important place that you should be humbled to be on because you are exercising the powers of government in a very select group of people who have been elected in each of their states statewide to serve this country. It is, to me, very important for both specific deterrence and general deterrence that people know, if they are illegally on the Senate Floor and you are caught, you do go to jail, particularly in the midst of a riot when you are interrupting a constitutionally mandated process necessary for the peaceful transfer of power.

*United States v. Bender*, No. 21-cr-508 (BAH), Sent. Tr. 4/23/23 at 109.

---

[7] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *Fischer v. United States*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[8] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

Moreover, U.S.S.G. § 5K2.21 provides that "[t]he court may depart upward to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range." Here, Irwin was not charged with civil disorder in violation of 18 U.S.C. § 231 for physically threatening officers as they were attempting to clear the upper west terrace, in part based on the government's assessment that the full set of charges against Irwin, including Count One, adequately captured the severity of his conduct at the time of charging, given his lie about his conduct.[9] This uncharged crime did not enter into the determination of Irwin's guideline range and provides an additional basis for an upward departure in his case.

---

[8] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

[9] And, as the Court knows, this conduct was not discovered by the government until the trial had started—after the defense counsel incidentally made a statement about the whereabouts of Mr. Irwin on January 6 that led the government to find additional video footage of his criminal conduct on that day.

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr. at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime. As Judge Bates stated,

> The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol . . . was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part.

*United States v. Languerand*, 21-CR-353-JDB, Sent. Tr., at 33-34. And, as another judge explained, the specific offense conduct of entering the Senate floor must be reflected when applying the sentencing factors set forth in 18 U.S.C. § 3553(a): "Going on to the Senate Floor, standing on the dais, having pictures taken, is criminal offense conduct that cries out for both specific and general deterrence and requires jail time." *United States v. Bender*, No. 21-cr-508 (BAH), Sent'g Tr. 4/23/23 at 79; *see also id.* at 102 ("This is not a run-of-the-mill obstruction. This was an obstruction of a constitutionally mandated procedure that happens every four years in

the country; this was very serious."). That is, the Court explained in determining an appropriate sentence that Defendants like Irwin and Richter,

> are not Defendants who simply walked in, walked around, and walked out of the Capitol Building during their 25 minutes unlawfully inside the Capitol Building. This really underestimates and understates the seriousness of the offense conduct to my mind. They are among the very few rioters who went and breached the Senate Chamber.

*Id.* at 104.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. (9/22/22); *United States v. Christian Secor*, 21-CR-157-TNM, Sent. Tr. (10/19/22); *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. Sent. Tr. (10/24/22); *United States v. William Watson*, 21-CR-513-RBW, Sent. Tr. (3/9/23); *United States v. Riley Williams*, 21-CR-618-ABJ, Sent. Tr. (3/23/23); *United States v. Hatchet Speed*, 22-CR-244-TNM, Sent. Tr. (5/8/23).

Judges of this court have upwardly departed in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. Most recently, in *United States v. Oliveras*, 21-CR-738-BAH, after a defendant's § 1512(c)(2) conviction was dismissed in light of *Fischer*, Judge Howell sentenced the defendant on the remaining charges, 18 U.S.C. § 231(a)(3); § 111(a)(1);  § 1752(a)(1) and (a)(2); and 40 U.S.C. § 5204(e)(2)(D) and (e)(2)(G)). She determined that an upward departure was warranted under U.S.S.G. § 5K2.7 (Disruption of Governmental Function). She explained:

> after *Fischer*, with the dismissal of [the defendant's] 1512(c)(2) conviction, none of the conduct that goes into determining defendant's sentencing guidelines reflect his intent to engage in political violence that poses such a threat to our American democracy…  His intent to obstruct Congress in the Electoral College certification by violence, if necessary, go above and beyond what any of his current convictions now take into account.

*Oliveras*, 21-cr-738 (BAH), Sent. Tr. at p. 49. The court noted that, "[i]n assessing the extent of the departure, review of how the guidelines for obstruction of an official proceeding at [U.S.S.G. §] 2J1.2 would have applied to defendant [pre-*Brock*] provide a general guide . . . [and] an upward departure within that range is appropriate." *Id.* at 49-50. The court also noted that it "would impose the same sentence with . . . an upward variance for the same reasons that are outlined in § 5K2.7 and consideration of the 3553(a) factors." *Id.* at 97.

From an advisory Guidelines range of 37-46 months' imprisonment, Judge Howell sentenced Oliveras to 60 months of imprisonment. *See also United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR-127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

In *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of *Fischer*, the government moved to dismiss the § 1512(c)(2) count. At sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that, despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posed a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sent, Tr. at 87-88. Judge Kelly found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95.

Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. Judge Kelly found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, Judge Kelly found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr. at 59. But Judge Cooper also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment.

Likewise, in *United States v. Dunfee*, 23-CR-36-RBW, Judge Walton sentenced a defendant on a § 231 conviction and a misdemeanor, after his § 1512(c)(2) conviction was dismissed in light of *Fischer*. Judge Walton found an upward departure was warranted under

U.S.S.G. § 5K2.7, because Dunfee's actions contributed to and resulted in a significant disruption of the certification of the electoral college vote. Moreover, noting that "the Sentencing Commission did not contemplate the circumstances that occurred on January 6," the court also found that a departure was warranted under U.S.S.G. § 5K2.0(a)(2) because Dunfee's criminal conduct related to "the attempt by a large number of individuals, including the defendant, to stop the peaceful transfer of power." *See United States v. Dunfee*, 23-CR-36-RBW, ECF No. 90 at 2. From an advisory range of 18 to 24 months, Judge Walton sentenced Dunfee to 30 months of imprisonment.

Because the seriousness of the Defendants' crime are not adequately captured by the applicable Guideline, an upward departure is appropriate here as well. If the Court declines to depart, upward variances are warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308-09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, Sent. Tr. at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks*, Sent. Tr. at 95; *see also United States v. Kelly*, 21-CR-708-RCL, ECF 151, Sent. Tr. at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal

bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("[G]iven the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward – even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.").

In past sentencings, this Court has made clear its view that January 6 was an unprecedented stain on this Nation's history:

> [E]ven during President Lincoln's second inauguration in the midst of Civil War in this country, nothing like this happened and there was an entirely peaceful transition of power. And the fact that there was not an entirely peaceful transition of power on January 6th or that January 6th was a mark on the peaceful transition of this power, to this day, every time I think about it, it leaves me pained, and it leaves people across this country pained, people across the world pained. The United States is supposed to stand as a beacon of democracy.

*United States v. Cua*, 21-cr-107 (RDM), July 25, 2023, Sent. Tr. at 193-194. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot.

Also unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[10]

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt*, 21-CR-32-DLF, Mem. Op. and Order

---

[10]Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638-TJK, Sent. Tr. 1/11/24 at 66-67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[11]

In this case, the government submits that an upward variance and/or departure of 9 months for Irwin and 4 months for Richter is warranted to reach an appropriate sentence.

In addition to accounting for the unprecedented nature of January 6, the government also

---

[11] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *United States v. Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

submits that, for Richter, while the Court determined that "the government likely proved beyond a reasonable doubt that Mr. Richter did aid and abet Mr. Irwin and Mr. Irwin's carrying of the sharp portion of the pole into the Capitol building," the Court could not convict Richter of aiding and abetting because of the structure of the Indictment. *See* ECF No. 158, May 14. Tr. at 38:7-13. But the Court can and should take into account the fact that Richter encouraged, supported, watched—*and facilitated*—Irwin's felonious conduct with his deadly and dangerous weapon.

**B.      The Court Has Authority To Impose Consecutive Sentences**

The statutory maximum sentences for Irwin's convictions under 18 U.S.C. § 1752(a)(1) and (b)(1)(A) and § 1752(a)(2) and (b)(1)(A) are ten years. The statutory maximum sentences for Richter for his convictions under 18 U.S.C. § 1752(a)(1) and (a)(2) is one year. Although the government's recommendation of 30 months' incarceration for Irwin is well below the statutory maximum for his § 1752 convictions, its recommendation of 20 months' incarceration for Richter is above the statutory maximum for his convictions.

For this Court to impose a sentence of 20 months of incarceration on Richter, it would need to impose partially consecutive sentences on some counts. Under U.S.S.G. § 5G1.2(d), where the sentence to be imposed exceeds the statutory maximum of any one count, the remainder of the sentence shall run consecutively, to the extent needed to produce a combined sentence equal to the total punishment. The government respectfully requests that the Court sentence Richter to a term of 20 months of incarceration.  As discussed below, to achieve this sentence, the Court would need to impose partially consecutive sentences on some counts.

A federal court "can typically choose whether to run" a defendant's "sentences concurrently or consecutively."  *Lora v. United States*, 599 U.S. 453, 455 (2023); *see also Setser v. United States*, 566 U.S. 231, 236 (2012) ("Judges have long been understood to have discretion

to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose . . . .").  While the Sentencing Guidelines default position is that sentences of imprisonment run concurrently, "if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts *shall* run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."  U.S.S.G. § 5G1.2(d) (emphasis added); *see also United States v. Lafayette,* 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

Moreover, "although the Guidelines should be the starting point and the initial benchmark, district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 490 (2011). Specifically, 18 U.S.C. § 3584(a) provides that "[i]f multiple terms of imprisonment are imposed on a defendant at the same time . . . the terms may run concurrently or consecutively," while Section 3584(b) states that "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in [18 U.S.C.] section 3553(a)."  District Courts thus have discretion to deviate "from the guidelines' recommendation that a defendant's sentences run concurrently and to impose, instead, consecutive sentences after considering the § 3553(a) factors.  *United States v. Lymon*, 905 F.3d 1149, 1153 (10th Cir. 2018).

Here, the § 3553(a) factors counsel that Richter be sentenced to a term of incarceration above the statutory maximum sentence for Count Three and that his sentence of incarceration run consecutively with Count Five. January 6 was an unprecedented crime, and the magnitude of

Richter's participation in that crime is not accounted for in his Guidelines calculation. Richter's remaining convictions for misdemeanor offenses do not adequately reflect the severity of his conduct on January 6, when he was one of just a few rioters who made it onto the Senate floor, seeking actively to interfere with the Electoral College certification.

The government is aware of at least two January 6 cases where a defendant's sentence ran consecutively. *See United States v. Nordean, et. al*, 21-cr-175 (TJK), Sep. 5, 2023 Minute Entry; *United States v. Neely*, 21-cr-0642 (JDB) Sep. 5, 2023 Sent. Tr. at 42.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

### A.  The Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Defendants' conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Both Defendants traveled to Washington, D.C. after vocalizing complaints about the alleged fraudulent election and extensively planning and preparing for revolutionary-like violence on January 6. The Defendants talked about coming to D.C. "open militia," they talked about being patriots and doing legendary things, tipping the scales of fear in the Supreme Court, removing people, and dressing as revolutionaries. The goal was clear: to keep the former president in power. The Defendants were unequivocal in their willingness to answer the call to fight.

### B.  Defendants' History and Characteristics

Irwin is 44 years old and lives in Kentucky with his wife and three children. PSR ¶ 93. Richter is 40 years old and lives in Florida with his wife and two children. PSR ¶ 88. Neither defendant has a criminal history and both appear to have stable lives.

Irwin was enlisted in the U.S. Army from 1999 to 2010. He served as a military police office while employed by the Army. PSR ¶ 131. He was dishonorably discharged. PSR ¶ 131. Following his dishonorable discharge from the Army, he worked for 7 years as a Sheriff's Deputy at the Hardin County, Texas Sheriff's Office. PSR ¶ 126. Irwin reported injuries that he suffered as part of his military service, *see* PSR ¶ 102, and he has received disability payments and been unemployed since 2016. PSR ¶¶ 124-25. Additional records requested by the Probation Office were not received. PSR ¶ 131.

Richter enlisted in the Army Reserve in October 2001. PSR ¶ 128. He was released from active duty in October 2009 due to "disability, temporary." PSR ¶128. Richter reported suffering traumatic brain injuries from his time in the military. PSR ¶¶ 98, 101. Richter is also unemployed due to disability. PSR ¶¶125-126.

Although both Defendants are veterans who once defended the Constitution from all enemies, foreign and domestic, on January 6, they willingly betrayed their nation and became enemies of the United States. While Irwin and Richter should be credited for their military service, it is also a troubling aspect of each defendant's history and characteristics when applied to this case. Irwin's and Richter's actions on January 6 were fundamentality antithetical to their military careers. Based on each defendant's military experience, they knew, more than the average citizen, that allegiance to the United States of America takes precedent over allegiance to any political party or any one person. This was particularly true for Irwin, who worked as both an Army police officer and a Sheriff's Deputy. But the Defendants ignored that. When they planned for their trip to Washington, D.C., the Defendants did so in military-style parlance—comparing their trip to the Revolutionary War and preparing to bring black flags. When the Defendants donned these black American flags at the Capitol and did so while breaching and occupying the United States Capitol,

a beacon of democracy for all Americans, it was a shameful dereliction of duty to the country these Defendants served. So, while their lack of any criminal history is mitigating, the Defendants' other characteristics, namely, their military service, neutralize the benefit of a lack of criminal history under 18 U.S.C. § 3553(a). Moreover, both Defendants understood their criminal nature of their conduct, as is evidenced by their post-January 6 text messages where they concocted a "plan" to delete evidence and cover-up their conduct, as noted above. Again, Irwin, especially, should have understood the seriousness of intentionally obstructing a police investigation into his criminal activity, yet he did so anyway.

Additionally, while both Defendants have reported suffering from PTSD as a result of their military service, the Court should consider that both Defendants in this case attempted to improperly use these diagnoses to their advantage in trial after the government discovered additional incriminating video evidence during trial. Both defense teams moved for mistrials and mid-trial continuances, claiming that, coincidentally and totally incredibly, each defendant had somehow forgotten this same aggravating and violent conduct, all due to their service-related PTSD. Neither defendant had any trouble remembering in great detail other happenings from that day, and their late formed "I don't remember" excuses ran directly afoul of statements that the Defendants earlier provided to the FBI. The Court should not only discredit these lies and be skeptical of any claim at sentencing that PTSD excuses or mitigates their conduct, but it should also consider in its specific deterrence analysis the Defendants' willingness to abuse in this manner the typical valor connected with military service.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. This factor supports a sentence of incarceration, as it does in most cases, including misdemeanor cases,

arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence:* The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

*Specific Deterrence:* The need for the sentence to provide specific deterrence to these particular Defendants weighs heavily in favor of incarceration. Neither defendant has expressed remorse or acknowledged the seriousness of their conduct. That, combined with their threatening rhetoric leading up to January 6, their actions on January 6, and their willingness to obstruct law enforcement in its post-riot investigation all require a sentence sufficient to specifically deter Defendants from participating in future, violent riots. Additionally, during trial, when Irwin testified, he did the opposite: Irwin repeatedly minimized his conduct, justified his unlawful actions, and refused to accept reality.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[13] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Although Richter's pre- and post-January 6 statements and posts were more inflammatory than Irwin's—such as Richter's gun-loading video (Ex. 518 at 541; Ex. 570); Richter's reference to Washington, D.C. and killing "them in their sleep" like George Washington on the Christmas eve (Ex. 518 at 506); Richter's statement that they were "going" to D.C. on January 6 to "offer our hands personally to snatch" people "up" (Ex. 518 at 565); and Richter's post-January 6 text that January 6 was "a proud AF [as fuck] movement, rinse and repeat if they fuck around" (Ex. 518 at 784)—Irwin's overall conduct on the day itself was more aggravating. It was Irwin, for example, who aggressively threatened police officers on the upper west terrace when he smashed his walking stick into pieces while screaming at the officers to "GO HOME!" Irwin then placed the sharp,

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach Defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

spear-tipped end of the broken walking stick facing upwards in his backpack, so it menacingly stuck out as he approached an entrance to the Capitol Building. And, after Richter re-armed Irwin with a new dangerous weapon—one end of Richter's "guidon" flagpole—it was Irwin who repeatedly slammed the metal-tipped end of the flagpole into the floor of the Senate Chamber as he loudly and belligerently screamed "DON'T GIVE IT BACK TO 'EM NOW!" Ex. 505. For this reason, Irwin was convicted of multiple felonies involving a dangerous weapon, warranting a significantly lengthier sentence than Richter.

Beyond comparing co-defendants, these Defendants are most comparable to the relatively small group of defendants who occupied the Senate Floor. Many of these defendants took the same path through the Capitol building, were part of the group that overran the same lines of officers, and ultimately occupied the Senate Chamber where the certification process had been scheduled to take place. The significance of this room cannot be understated; many of the rioters on January 6, these Defendants included, expressed desires and goals to stop the constitutional process that was scheduled on January 6, 2021 in the Senate and House Chambers. That these Defendants expressed these desires, and ultimately, in an unprecedented act, successfully breached the building and occupied the room where that process was supposed to take place, is highly aggravating. Some comparable cases are the following:

*United States v. Joshua Black*, 21-cr-00127-ABJ. On January 6, after breaching the barricade on the lower west terrace, Black positioned himself at the front of the large, unruly crowd gathered at the west plaza, and was shot in the face with a crowd-control munition. Despite suffering a gaping wound from the shot and witnessing numerous assaults on police officers, Black moved closer to the Capitol and joined in the breach of the East Rotunda Doors. Once inside the Capitol, Black approached two officers who had just been attacked, and defiantly shouted at the

officers as they retreated, "WE WILL NOT STAND DOWN!" Then, he breached the Senate Chamber, where he remained for over 20 minutes. Black rifled through Senators' papers, took a photo of a document related to an objection to the certification of Arizona's Electoral College vote count, posed for photos on the Senate dais, sprawled himself on the floor talking on his cellphone, disregarded Technician Robishaw's repeated requests to leave, and joined the same disorderly spectacle styled as a prayer.

Like Irwin and Richter, Black did not leave the chamber until MPD officers finally amassed the resources to drive him and others out. On January 6, Black was armed with, but did not use, a dangerous weapon, a concealed knife. During and after January 6, Black made statements advocating for "independence" and abolishing the government. Judge Berman-Jackson calculated the defendant's sentencing guideline range at 12 to 18 months but found that an upward departure was warranted based on U.S.S.G. 5K2.7. She sentenced Black to 22 months of incarceration, without a § 1512 conviction.[14]

Like Black, Irwin and Richter participated in a breach of a police line—Black by the East Rotunda Doors and Irwin and Richter in the Brumidi Corridor and at the North Appointment Desk. All three of the defendants were among the small group of rioters that occupied the Senate Chamber not long after lawmakers had been emergency evacuated. All of the defendants revealed their purpose in breaching the Capitol through messaging and posting.

Irwin's conduct, however, was more aggravated than Black's. Unlike Black, Irwin approached police officers in a threatening manner and smashed a pole on the ground while screaming at them to "GO HOME!," he banged his metal-tipped pole on the ground throughout

---

[14] Like Irwin, following a bench trial, Black was convicted of 18 U.S.C. § 1752(a)(1), (b)(1)(A); 18 U.S.C. § 1752(a)(2), (b)(1)(A); and related Class B misdemeanors.

the Capitol and yelled things like, "THIS IS OURS!," and he incited and encouraged rioters in the Senate Chamber. Thus, while both defendants were armed with weapons, it is only Irwin who took steps to *use* his weapon. Irwin's and Richter's pre-planning rhetoric was far more violent than Black's, and their plans were far more elaborate. Additionally, while Black also exercised his right to trial, Irwin repeatedly lied under oath while testifying, and both Defendants lied to the FBI during the course of the investigation. Thus, a higher sentence is warranted for Irwin and Richter.

*United States v. Jacob Chansley*, 21-cr-00003 (RCL). Prior to January 6, Chansley used his social media presence to spread false information and hateful rhetoric. He wrote things like, "We shall have no real hope to survive the enemies arrayed against us until we hang the traitors lurking among us." After reaching the Capitol on January 6, Chansley climbed a media tower erected for the upcoming Presidential inauguration. He entered the scaffolding amongst utter chaos on the west front. He joined rioters in pushing past the police line at the top of the scaffolding and entering the upper west terrace. Chansley was one of the first 30 rioters who illegally entered the Capitol building. Eventually, after confrontations with police officers in the Ohio Clock Corridor, he was stopped by police in the Senate Gallery, where he bellowed a series of chants and obscenities— including, "Time's up, motherfuckers!"

Chansley made his way to the Senate Floor. He ascended the Senate Dais where he wrote a threatening note to the Vice President: "ITS ONLY A MATTER OF TIME JUSTICE IS COMING!" Chansley repeatedly ignored officers' commands to leave, instead proclaiming "Mike Pence is a fucking traitor." Then, he called other rioters to the Dais and led them (including Irwin and Richter) in his prayer-like incantation over his bullhorn.  When officers arrived on the Senate floor, Chansley screamed "FREEDOM" in his bullhorn as he was being escorted from the building. After January 6, Chansley gave interviews to news outlets and said things like, "the fact that we

had a bunch of our traitors in office hunker down, put on their gas masks and retreat into their underground bunker, I consider that a win."

Although he had no prior convictions, Chansley faced a higher sentencing range than Irwin and Richter—41 to 51 months—because he received an enhancement for threatening to cause physical injury. Chansley also demonstrated considerable acceptance of responsibility: on January 7, 2021, he called the FBI to identify himself and drove to an FBI field office to continue his interview, at which time he was arrested. Chansley was one of the first January 6 defendants to accept responsibility and plead guilty. Judge Lamberth sentenced Chansley to 41 months of incarceration.

Here, Irwin and Richter, like Chansley, made their way through the chaos on the west front to reach the Capitol building. Like Chansley, Irwin and Richter were part of a group that engaged in several confrontations with police officers after entering the Parliamentarian's Door. Irwin and Richter, also like Chansley, repeatedly ignored officers' orders to leave the building. Irwin and Richter eventually made it to the Senate Floor and stood near the Senate Dais while Chansley "prayed." After Chansley spoke, Irwin and Richter celebrated with him.

Unlike Irwin and Richter, Chansley accepted responsibility, pled guilty, and expressed remorse for his actions. Chansley has the additional aggravating conduct of entering more areas of the Capitol building than Irwin and Richter; writing a threatening letter to the Vice President; and encouraging and inciting more rioters during the Capitol breach. Thus, a comparable, but lesser, sentence is appropriate for Irwin and Richter.

*United States v. Christian Secor,* 21-cr-00157-TNM. Secor entered the Senate Wing Door just 13 minutes after the initial breach. Unlike Irwin and Richter, Secor entered House Speaker Nancy Pelosi's office. He assisted a group of rioters inside the building in forcing open the East

Rotunda Doors that were guarded by USCP officers. Secor's conduct helped to overpower these officers and facilitate other rioters' entry into the Capitol building. Secor then entered the Senate Chamber (first the gallery and then the floor) where he mounted the Senate Dais and sat in the Vice President's chair.

Although this conduct was similar to Irwin's and Richter's conduct of joining a mob that overpowered several lines of police officers to gain access to the hallway that led to the Senate Chamber, Secor's role was more direct—at least than Richter's role—in the breach. *But see* Ex. 509 (Irwin's selfie while officers were "pinned" in corner); Trial Tr. at 89 (1/22/2024). And Secor's conduct helped facilitate entry of others into the Capitol building, which is more aggravating than Irwin's and Richter's conduct here. However, all three of these defendants witnessed the same type of violence and destruction prior to entering the building, followed similar paths into the Capitol, and gained access to similar areas of the building, ultimately ending in the Senate Chamber. Judge McFadden sentenced Secor to 42 months of imprisonment.[15]

Like Irwin and Richter, Secor was in the small group of rioters who occupied the Senate Floor on January 6. Whereas Secor sat in Vice President Mike Pence's chair, Irwin and Richter sat in senators' chairs. All three Defendants were prideful in their actions following January 6. Unlike Irwin and Richter, Secor accepted responsibility and entered a guilty plea. However, Secor faced

---

[15] *See also United States v. Bender*, 21-cr-508 (BAH) (Senate Floor defendant sentenced to 21 months); *United States v. Priola*, 22-cr-242 (TSC) (Senate Floor defendant sentenced to 15 months); *United States v. Colt*, 21-cr-74 (TFH) (Senate Floor defendant sentenced to 15 months); *United States v. Shalvey*, 21-cr-334 (TJK) (Senate Floor defendant sentenced to 41 months); *United States v. Roche*, 21-cr-86 (BAH) (Senate Floor defendant sentenced to 18 months); *United States v. Adams*, 21-cr-354 (APM) (Senate Floor defendant sentenced to 14 months); *United States v. Johnson*, 21-cr-80 (CRC) (Senate Floor defendant sentenced to 24 months); *United States v. Cua*, 21-cr-107 (RDM) (Senate Floor defendant sentenced to 12 months); *United States v. Paul Hodgkins*, 21-cr-188-RDM (Senate Floor defendant sentenced to 8 months); *United States v. Kelly*, 21-cr-708 (RCL) (Senate Floor defendant sentenced to 12 months).

a higher sentencing range of 51 to 63 months, in part due to multiple potential enhancements for threatening injury or property damage. Based on their actions, the Defendants, particularly Irwin, should receive a comparable, but lesser sentence than Secor did.

## VII. Restitution

The Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Irwin and Richter were convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use

the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[16]

Because the Defendants engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and each of their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for their individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more

---

[16] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require both Irwin and Richter to pay $2,000 in restitution for their convictions. This amount fairly reflects Irwin's and Richter's roles in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   Fine

Irwin's convictions subject him to a statutory maximum fine of $250,000 for Count Two and Count Four, and $5,000 for each of Counts Six through Eight. Richter's convictions subject him to a statutory maximum fine of $100,000 for Counts Three and Five, and $5,000 for each of Counts Six through Eight.

In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining

that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the Defendants have not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    Conclusion

Balancing these factors, the government recommends that this Court sentence Joseph Irwin to 30 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a $230 special assessment; and sentence John Joseph Richter to 20 months of incarceration, 36 months of supervised release, $2,000 in restitution, and an $80 special assessment. These sentences would protect the community, promote respect for the law, and deter future crime by imposing restrictions on the Defendants' liberty as a consequence of their behavior.

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

BY:    /s/ *Ashley Akers*
ASHLEY AKERS
Senior Trial Counsel
Capitol Siege Section Detailee
MO Bar No. 69601
601 D Street, N.W.
Washington, D.C. 20530
202-353-0521
Ashley.Akers@usdoj.gov


SAMANTHA MILLER
Special Assistant U.S. Attorney
MATTHEW VIGEANT
Assistant U.S. Attorney