**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**(Electronically Filed)**

**CRIMINAL ACTION NO.  1:21CR-589-RDM**
**UNITED STATES OF AMERICA,**                                                        **PLAINTIFF,**

**vs.**

**JOSEPH IRWIN,**                                                        **DEFENDANT.**

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

Comes the Defendant, Joseph Irwin ("Defendant," or, in the alternative, "Joe"), by counsel, and respectfully requests this Honorable Court to consider the following factors and sentence him to a probated sentence with the condition of 12 months home detention.  In support, the Defendant states as follows:

## I.  INTRODUCTION

Hundreds of defendants have been sentenced for their actions on January 6, 2021.  Like Joe, those Defendants had varying backgrounds and roles in the events on that day.  Joe now respectfully requests the Court examine him as an individual—focusing not just on his actions on his worst day, but his history and characteristics of law-abidingness, service to his country (and its toll) and his family responsibilities.

Joe was convicted of two (2) Class C felonies and three (3) Class B and C misdemeanors.  The U.S. Probation Office's guideline calculations for these offenses is 12 to 18 months imprisonment.  The U.S. Probation Office is recommending 12 months incarceration.  Joe is respectfully requesting the Court vary and/or depart two (2) levels from the calculated guideline range based upon the following:

- USSG §5K2.13 (diminished capacity) and/or §5H1.3 (mental health) or variance based thereon;

- USSG §5H1.11 (military service) or variance based thereon;

- 18 U.S.C. §3553(a) and (b) variance based upon his history and characteristics, specifically, his lack of criminal record and caretaker/financial responsibilities.

A 2-level departure or variance would place Joe at an offense level 11; as applied to a criminal history category I, his guideline range would be 8 to 14 months in Zone B of the Sentencing Table. The requested sentence of probation with a condition of home incarceration would be appropriate pursuant to USSG §5C1.1(c)(3). Such a sentence is sufficient but not greater than necessary pursuant to 18 U.S.C. §3553(a) and (b) because of (1) Joe's service-related mental health issues; (2) need for mental health treatment; (3) his familial and financial responsibilities; and (4) lack of criminal record.

## II. PRE-SENTENCE REPORT

### A.    Factual Objections

Paragraph 31: Probation's mischaracterization of the defendants discussing "their roles" in "potential violence." In response to the Defendant's objection, Probation notes the text messages between Joe and his co-defendant, with a primarily emphasis on the text messages sent by the co-defendant. The texts attributed to Joe consist of him asking whether to go "open militia or innocent bystander" and "if not now, then when?" As Joe contended throughout the bench trial of this matter, he did not intend to partake in violence and continues to maintain that position. Further, Probation cites to Joe carrying the wooden stick. However, as argued throughout the trial, Joe was not dressed in attire supporting a plan to participate in violence, i.e. to use the walking stick as a weapon. Although he had access to various items due to his military and police service, he did not have with him, nor was he wearing goggles, a gas mask, helmet, bullet proof vest, metal

knuckled gloves or steel-toed boots.  He likewise didn't carry with him a baton, pepper spray or zip ties.  This evidence contradicts Probation's position.

Paragraph 37:  "while carrying their poles, the pair progressed to the front of the mob where a line of police officers fought against violent rioters attempting to break through the line."  This characterization of the events involving Joe is contradicted by trial exhibits 411 and 908.

Paragraph 42:  objection to the term "wielding."  Joe maintained throughout the course of the bench trial that he did not carry either the walking stick or the flag pole with the intent to use those items as dangerous weapons.  Based upon the evidence and arguments at trial, Joe maintains this position and continues to object to the term "wielding" to describe his carrying of the walking stick and flag pole.

### B.    Legal Objections

Paragraphs 57 and 177: $2,000 in restitution.  Joe objects to this amount of restitution because it is not reflective of his portion of the liability for the damages done to the Capitol on January 6, 2021.  Restitution is mandated for Joe's offenses pursuant to the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §3663A.  An order of restitution under the MVRA is to be issued and enforced in accordance with 18 U.S.C. §3664.  18 U.S.C. §3663A(d).  While 18 U.S.C. §3664(f)(1)(A) mandates that the Court order restitution to the victim in the full amount of the victim's losses, when there is more than one defendant, the Court may apportion the liability among the defendants.  *See* 18 U.S.C. §3664(h).  18 U.S.C. §3664(h) provides, "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may...apportion liability among the defendants to reflect *the level of contribution to the victim's loss and economic circumstances of each defendant*."  (Emphasis added).  The Court is, thus, authorized pursuant to

this statute to apportion liability for restitution among defendants to reflect their level of contribution to the victim's loss and to consider their ability to pay. *See* 18 U.S.C. §3664(h).

Joe did not personally damage or destroy any property while he was in the Capitol on January 6, 2021. During the bench trial of this matter, Joe's time in the Capitol and on Capitol grounds is captured on video. There is no visual depiction of him destroying government property. This is further evidenced by the fact that the U.S. has not presented any specific loss amount specifically attributable to Joe. On this point, the $2,000 restitution amount, while generally agreed to in plea agreements, has not been shown to correlate to any specific damage. That is, it is an arbitrary number that has no supporting evidence as to why this amount has been chosen by the U.S. to enforce against all January 6 defendants. Lastly, the U.S. Probation office has deemed Joe unable to pay a fine. Coupled with the fact that he is indigent and represented by the federal defender's office, his economic circumstances do not support the requested $2,000 in restitution.

## III. STATUTORY SENTENCING RANGE, ADVISORY GUIDELINE RANGE AND SENTENCES AVAILABLE

Joe was found guilty to the following offenses which carry the following penalties:

- Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §1752(a)(1) and (b)(1)(A): up to 10 years imprisonment; $250,000 fine; and up to 3 years of supervised release.

- Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon in violation of 18 U.S.C. §1752(a)(2) and (b)(1)(A): up to 10 years imprisonment; $250,000 fine; and up to 3 years of supervised release.

- Entering or Remaining on the Floor of Congress in violation of 40 U.S.C. §5104(e)(2)(A): up to 6 months imprisonment; $5,000 fine; and no supervised release.

- Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(D): up to 6 months imprisonment; $5,000 fine; and no supervised release.

- Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(G): up to 6 months imprisonment; $5,000 fine; and no supervised release.

4

Pursuant to 18 U.S.C. §3561(c)(1) and (2), Joe is eligible for up to a 5 years-term of probation for his convictions.

The U.S. Probation Office calculated Joe's total offense level at 13. DN 184 at ¶80. Joe has no prior criminal history and, therefore, falls within a Criminal History Category I. *Id.* at ¶83. Offense level 13 applied to a criminal history category I results in an advisory guideline range of 12 to 18 months. U.S. Probation recommends a sentence of 12 months to serve.

Joe is requesting the Court grant a downward departure from the applicable guideline range pursuant to USSG §5K2.13 and/or §5H1.3, 5H1.11 and/or a variance under 18 U.S.C. §3553(a) and (b) of 2 levels. This results in an offense level 11; as applied to criminal history score I, Joe's advisory guideline range is 8 to 14 months and in Zone B of the Sentencing Table.

USSG §5B1.1 (b) provides that Joe is eligible for probation because he stands convicted of a Class C felony and B and C misdemeanors. USSG §5C1.1(c)(3) provides, in relevant part, that "[i]f the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by…a sentence of probation that includes a condition or combination of conditions that substitute…home detention for imprisonment."

## IV. UNITED STATES' OBJECTIONS AND MOTIONS FOR DEPARTURE
### A. The U.S. Waived Its Objections to the PSR by Failing to Timely Object

The United States failed to timely provide objections to the initial PSR. The draft PSR was filed on November 18, 2024. ECF 178. All "inaccuracies or disputes to the presentence report (PSR)" were due on December 3, 2024 per FRCrP 32(f)(1) and (2). *Id.* The U.S. **never** filed a response stating any disputes with or objections to the guidelines contained in the PSR. *See* ECF 184 at 33. To circumvent this failure, the government now argues in its sentencing memorandum for the Court to impose guidelines not determined by the U.S. Probation Office. ECF at p. 28.

FRCrP 32(f)(1) states that "[w]ithin 14 days after receiving the presentence report, the parties **must state in writing any objections, including…sentencing guidelines ranges.**" (Emphasis added). Failure to object in 14 days allows the Court to accept the PSR's findings. *See U.S. v. Ventura,* 650 F.3d 746, 750 (D.C. 2011) ("[r]ule 32(f)(1) allows 14 days for a defendant to 'state in writing any objections, including objections to material information contained in a PSR. Ventura failed to do so, and, consequently, the district court properly accepted the PSR's findings as fact") and *U.S. v. Stokes,* 2014 WL 129166900 (D.C. Oct. 10, 20014) ("Rule 32 provides that a defendant may bring objections to his presentence report, but he is limited to bringing these objections within fourteen days of receiving the presentence report"). Further, FRCrP 32(g) provides that the Probation Office must submit the final presentence report to the Court with "an addendum containing any unresolved objections, the grounds for those objections and the probation officer's comments on them."

The U.S. first objects to the guideline calculations by the U.S. Probation Office by arguing for a 2-level enhancement for Obstruction of Justice pursuant to USSG §3C1.1. ECF 186 at p. 28. The U.S. bases this objection on the allegation that Joe lied to the FBI during the investigation, got rid of his clothes and lied during trial. *Id.* at p. 31.

An enhancement pursuant to USSG §3C1.1 is separate from any potential Chapter 2 calculations in this case. That is, it is not necessary for the Chapter 2 guideline calculations in this matter to be completed to determine if Chapter 3 enhancements apply. *See* Application Note 7 to USSG §3C1.1(provides a list of offenses to which §3C1.1 is in applicable; none of which Joe's convictions correspond). Thus, the U.S. cannot argue that it couldn't make this objection until after the final PSR was issued with the new guidelines following the vacatur of the 18 U.S.C.

§1512 conviction.  To this point, the Defendant timely objected to the initial PSR concerning the facts and application of certain .  *See* ECF 180.

Likewise, the U.S. failed to object to the Probation Office's recommendation that there are no circumstances identified that are not adequately considered by the guidelines in reference to the application of departures.  ECF 178 at ¶177.  Like a Chapter 3 enhancement, departures are considered separate and apart from Chapter 2 enhancements.  The time to object to Probation's determination as to the applicability of departures was on December 3, 2024 and the U.S. failed to do so.  Now, as discussed below, the government is requesting to double Joe's guidelines and impose a sentence of 30 months based upon three separate upward departures.

The U.S. simply failed to timely object to Probation's guideline calculations and findings. Pursuant to *Ventura* and *Stokes,* it has waived these objections as untimely.  Accordingly, the Court should not consider these objections or arguments on departures in determining the proper guideline range.

Further, the U.S.'s failure to raise these objections precluded the U.S. Probation Office from responding.  This is a clear violation of FRCrP 32(g). And, it goes without saying that failing to timely provide the objections and arguments on departures, but including them in the U.S.'s sentencing memo which is due one day before the Defendant's memo, puts the defense at a disadvantage to answer to those objections in one day.

**B.  Defendant's Response to the U.S.'s Objections to the Guidelines**

Assuming *in arguendo* the U.S.'s violation of FRCrP 32 is allowed, the application of USSG §3C1.1 is improper.  Qualifying conduct under this enhancement must be material.  *See* Federal Sentencing Guidelines Handbook at p. 118 ("The obstructive conduct must be material; that is, it must have some impact on the investigation or prosecution of the federal offense").

Material is defined by the Application Notes as "evidence ,fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Application Note 6 to USSG §3C1.1.

The U.S. contends that Joe provided untruthful information to the FBI by saying that he went alone to the Capitol and this caused a significant delay in the FBI's investigation. First, materiality in the investigation occurs when the defendant's conduct weakens the government's case or prolongs the pendency of the charges. *See U.S. v. Singer,* 963 F.3d 1144 (11th Cir. 2020) (defendant's false statements were material because they went to one of his core defenses); *U.S. v. Maccado,* 225 F.3d 766 (D.C. Cir. 2000) (defendant's failure to provide the court with a handwriting exemplar had the potential to weaken the government's case and prolong the pendency of the charges). The increase is improper where a defendant's conduct does not significantly impede the investigation. *See U.S. v. Ahmed,* 324 F.3d 368 (5th Cir. 2003) (defendant's statements to FBI agents simply caused the FBI to go forward with their investigation as they normally would, tracking down possible leads); *U.S. v. Rosales,* 990 F.3d 989 (6th Cir. 2021) (reversing where district court failed to find the defendant's destruction of his phone materially hindered the investigation). Joe told the FBI that he took a video of himself at the Capitol and that it was on his phone, which he gave them full access to. Trial Exhibit 513 at pp. 30 and 32. In the video selfie that he took, the very first thing he says is "John Richter." Trial Exhibit 505. The FBI, thus, had the co-defendant's name from the very beginning of the investigation. Further, his text messages, easily accessible to his phone, were clearly to and from John Richter regarding their planning and attendance of the Stop the Steal rally. It was not Joe's statement to the FBI that caused a "significant delay" in the investigation. That is, it was not a material fact.

The U.S. also argues that Joe's direction to tell his sister to trash his clothes supports an increase under USSG §3C1.1.  However, this direction occurred before the investigation began.  And, Joe told the FBI of these actions.  Trial Exhibit 513 at p. 15.  He explained that he didn't "want anything to do with this stuff." *Id.*  Further, as discussed above, Joe gave the FBI access to his phone and explained the photos and videos they would find.  Such actions contradict a finding of obstructing or impeding an investigation.  Obviously, photo and video evidence is much stronger and better evidence than the clothes he was wearing that day.  The latter, quite frankly, doesn't have evidentiary value other than showing that Joe is the person depicted on the videos and in photos.

The U.S.'s other argument centers on Joe's discussions with the FBI regarding the "pole." It is obvious from Trial Exhibit 513 that there was confusion about what constituted the "pole." FBI Agent Powers asked Joe why he had a pole in his hand when he went inside the Capitol.  Trial Exhibit 513 at p. 20.  Joe told him originally that was his walking stick named Abel and that it was broken that day before he went in the Capitol.  *Id.* at pp. 21-22.  A conversation then ensues about the pole because the Agent saw Joe walk into the Capitol with a stick.  *Id.* at pp. 22-23.  Joe tells Agent Powers that he shoved a piece into his backpack.  *Id.* at p. 24.  Agent Powers tells him, "No, I seen [sic] the pole in your hand.  Then there was something in your backpack, which I was gonna ask you what that was (UI)." *Id.* at 24.  Joe then realizes what to what the Agent is referring and tells him that he saw a flagpole in Joe's hand.  *Id.*

Lastly, the U.S. continues to argue against Joe's memory issues on January 6, 2021 regarding the breaking of the walking stick.  As discussed in detail below, Joe suffered from a PTSD dissociative episode that caused memory issues.  Expert testimony was presented, without the U.S. presenting any expert testimony to contradict, that Joe's memory was affected by his

PTSD symptoms.  The U.S. does not present in its sentencing memorandum any contradictory expert evidence.  For the increase to apply, the Court "must find that the misrepresentations were willful, material to the investigation or prosecution, and made with specific intent to obstruct justice, rather than as a result of confusion, mistake or faulty memory."  Federal Sentencing Guidelines Handbook at p. 131.  As demonstrated by the evidence at trial, Joe's faulty memory was just that; not a willful misrepresentation.

### C.  Defendant's Response to the U.S.'s Motion for Upward Departure

The U.S. argues that an upward departure pursuant to USSG §5K2.0(a)(2) is appropriate because Joe's 18 U.S.C. §1512 conviction was vacated under *Fischer.*  ECF 186 at p. 35.  Reliance on this as a basis for departure is inappropriate.  First, it is clear under *Fischer* that Joe should never have been charged with a violation of 18 U.S.C. §1512.  While the conviction was vacated, the U.S. chose not to pursue another trial only after the Court's comments about the insufficiency of the evidence on retrial.  Presumably, these comments were based upon the arguments set forth in the Defendant's Reply in Support of his Motion for Judgment of Acquittal (ECF 168) that the U.S. doesn't have the evidence to support this charge.   Under the new guidelines, USSG §1B1.3(c), acquitted conduct is not to be considered under a relevant conduct analysis.  While Joe has not been acquitted for a violation of 18 U.S.C. §1512 due to the procedural posture of this case, based upon the evidence known to the Court and all parties, the underlying policy of USSG §1B1.3(c) should apply here.

Pursuant to USSG §5K2.0(a)(2), the U.S. is asking the Court to impose a sentence of 30 months, which is almost twice the high end of the guideline range determined by Probation (12 to 18 months).  Specifically, the U.S. argues that a departure is warranted because the circumstances "may not have been adequately taken into consideration in determining the applicable guideline

range" or "that 'the Commission has not identified in the guidelines but that nevertheless is relevant to determining an appropriate sentence.'" ECF 186 at p. 37. Aside from the lack of supporting evidence and argument to request such an extreme departure, the U.S. is relying upon the 1512 conduct. But, Joe's guideline range in the draft PSR for the 1512 conviction was only 15 to 21 months. Thus, the Commission and the guidelines have adequately taken into consideration the 1512 conduct and there are applicable guidelines. So, by the U.S. basing its argument on the 1512 conduct, their request of 30 months is even beyond the guideline range for that offense.

The U.S. cites to several cases in support of its motion for an upward departure when the 1512 charge is vacated or dismissed. However, those cases are distinguishable.

- *U.S. v. Sparks,* 1:21-cr-87-TJK. Mr. Sparks was among the first protestors to breach the police line; he pushed bike racks into the police; and, most importantly, he was the *very first protestor to breach and enter the Capitol*, doing so through a broken window. Judge Kelly called him the "tip of the spear."

- *U.S. v. Oliveras,* 1:21-cr-738-BAH. The Defendant was convicted of two felonies of Civil Disorder and Assaulting, Resisting or Impeding Certain Officers, as well as, four misdemeanors. DN 130. Body camera footage showed Mr. Oliveras pushing directly into officers at the front of a police line. ECF 106 at p. 16. The Defendant's guideline range was 37 to 46 months and the U.S. requested a sentence of 68 months. ECF 106.

- *U.S. v. Robertson,* 1:21-cr-34-CRC. The Defendant was convicted of the same counts as Joe, but with an additional 231 conviction. After he was arrested, "he trafficked in firearms in direct violation of [the] Court's Order." ECF 124. Specifically, he possessed a loaded M4 rifle and a partially assembled pipe bomb at his home and purchased "an arsenal of 34

firearms online and transport[ed] them in interstate commerce while under felony indictment." *Id.* The U.S. asked for 96 months incarceration. ECF 124.

- *U.S. v. Dunfee,* 1:23-cr-36-RBW. Defendant, a pastor, "led rioters in a collective push against the barricades" on the East Front; warned police officers that they would have to "fight" the crowd; directed the crowd for hours as to the weak spots to breach the barricades using a megaphone; members of the crowd considered him a "leader interested in breaching the barricades;" and he approached members of the Proud Boys to coordinate efforts to breach the barricades and take the building. ECF 85.

The U.S. also moves for an upward departure pursuant to USSG §5K2.7 for disruption of government function. To argue for this departure along with USSG §5K2.0(a)(2) is improper. Pursuant to the plain language of USSG §5K2.7, "Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense." Thus, if the U.S. is moving to depart under USSG §5K2.0(a)(2) for the 1512 conduct of obstruction, it cannot also move to depart under USSG §5K2.7 for the same conduct.

The U.S. further argues under USSG §5K2.21 that Joe could have been charged with an offense pursuant to 18 U.S.C. §231 and this would serve as a basis for an upward departure. ECF 186 at p. 37. However, defendants charged with that offense are sentenced pursuant to USSG §2X3.1 (an offense for which no guideline is expressly promulgated). These are then cross-referenced to USSG §2A2.4(a)—Obstruction or Impeding Officers. This is the same guideline applicable to Joe's current offenses. Accordingly, the sentence would be the same. An argument for an upward departure based upon this reasoning is, thus, without merit.

V.    **DEFENDANT'S MOTIONS FOR DEPARTURE, APPLICATION OF 18 U.S.C. §3553(a) FACTORS AND VARIANCES BASED THEREON**

   A. **Joe's History and Characteristics and Motions for Departures and/or Variances Based Thereon (18 U.S.C. §3553(a)(1))**

   As set forth in detail below, Joe is a parent, Army veteran, community volunteer, and former police officer.  He sacrificed his body and mind in service to his Country.  Joe has further contributed to his country and community through public service.  He does not have a history of protesting or radical behavior.  Up until January 6, 2021, he was an upstanding, law- abiding citizen.  Indeed, Joe does not have a criminal record.  His actions on January 6, 2021 are, thus, inconsistent with his life-long behavior.

   1. **Personal History**

   Joe is 44 years old.  He currently resides in Cecilia, Kentucky with his wife and three children—a 16 year old daughter; 8 year old son and 6 year old daughter.  He and his wife, Shyanne, have been married for 9 years and have resided at their current home for 7 years.  *See* letter from his wife, ShyAnne Irwin, attached as **Ex. A.**  Prior to his current marriage, Joe was a single father and sole caretaker of his oldest daughter, Alivia.  *See* letter from family friend, Katie Keary, attached as **Ex. B**;[1] letter from Joe's Aunt, Susie Jasper, attached as **Ex. C**; and letter from Sharon H. Oliver, attached as **Ex. D.**

   As the Court will recall from Shyanne's testimony, she is a full-time elementary school teacher.  So, Joe is a stay-at-home dad and primary care-taker of his children.  Joe's daily schedule with his children are as follows:

- 5:00 a.m.:  wake up
- 6:00 a.m.:
    - Shyanne leaves for work

---

[1] This letter was written in 2022 when the undersigned was negotiating with the U.S. prior to the Indictment charging him with a felony.

- o Joe wakes up their two youngest children, dresses them, feeds them breakfast and gets them ready for school.
- 6:45 a.m.:  Joe takes the two youngest to school
- 7:45 a.m.:  Joe returns home; helps get 16 year old daughter off to school
- 8:00 a.m.—1:15 p.m.:  Joe cleans, does chores, mows yard (in the summer), shops/prepares for dinner; prayer time; and errands.
- 2:00 p.m.—2:15 p.m.:
    - o Joe picks up the 2 youngest children from school
    - o Snack time and/or go to the park
    - o Homework
- 4:00 p.m.:  after school activities—taekwondo, soccer or track and field
- 5:00—5:30 p.m.:  Shyanne arrives home
    - o Dinner
- 7:00—8:30 p.m.:  night time routine of bathing kids, reading and getting ready for bed
- 9:30 p.m.:  Joe's bed time.

Per Joe, his family is the anchoring force in his life.   His, sister, Crystal Jenkins, who wrote a letter on his behalf, agrees with this; she states that "[h]e lives for his children and puts them first." *See* February 7, 2022 letter from Crystal Jenkins, attached as **Ex. E;** letter from Vernon Tyree, Joe's grandfather, attached as **Ex. F**; and letter from Carol Snider, attached as **Ex. G.**

Joe is a fully disabled veteran and, as a result, is dependent upon his monthly benefits.  Joe receives $6,046 per month in disability benefits.  DN 184 at p. 24.  Shyanne's income from teaching is roughly half that at $3,050.  *Id.*  When asked by probation about the financial effects that imprisonment would have on the family, Joe advised that he and Shyanne "have spoken about it" and they "assume they may lose their house and vehicles" and are taking the process "one step at a time."  *Id.* at ¶94.

Joe is not a member of any radical groups or organizations.  Nor has he posted on social media in support of any radical groups or organizations or about the events on January 6th.

Aside from his community service through his duties as a Sheriff's deputy (discussed below), Joe has contributed to his community by, among other things, coaching in a youth soccer league, helping fellow soldiers, and organizing events for a local non-profit organization.  *See*

14

letters Jessica Torres, attached as **Ex. H;**  Nanette Cross-Smallwood, attached as **Ex. I**; Jessica Van Meter, attached as **Ex. J**; and letter from Katie Keary, *supra*.  He helps his neighbors on a regular basis without any thought or need for recognition.  *See* letters from ShyAnne Irwin, Katie Keary, Jessica Torres and Crystal Jenkins, *supra*.  The central theme throughout all the letters received from family members is Joe's service and selflessness.

### 2.    Military History and Motion for Departure Pursuant to USSG §5H1.11

Joe is a United States Army Veteran.  He joined the Army National Guard straight out of high school, serving for 1 year.  He then joined the U.S. Army in 1999 at the age of 19. *See* DD214, attached as **Ex. K.**  While in the Army, Joe served primarily as a Military Policeman.  *Id.* He served on the Army Swat team from 1999 to 2003 and then became a K9 handler.  As an Army Swat team member, Joe provided swat protection for military facilities.  From 2003 to 2005, Joe was the drug K9 handler at Ft. Benning (the only one on base).  He then became trained as a bomb detection K9 handler in 2005.  He spent almost 11 years in the service, receiving an honorable discharge in 2010 with the rank of Sergeant, E-5.  *Id.*  As evidenced by the attached letter from a fellow soldier, Joshua Stickland, Joe was a role-model soldier.  *See* letter from Joshua Strickland, attached as **Ex. L.**  Following his service, Joe served as a civilian contractor with the Department of State from 2011 to 2012.  As a K9 handler, he was part of the protective service detail at the U.S. Embassy in Baghdad. From 2012 to 2013, Joe oversaw the Army Recruiting Social Media site.

Joe served three (3) tours of combat in Iraq in 2005, 2007-2008, and 2009.  *See* DD 214, and NCO Evaluation Reports, attached collectively as **Ex. M**.  As an example of the extent of his combat service, during Joe's 2007-2008 tour, he "successfully participated in 65 raids and searches to disrupt multiple terrorist networks;" "conducted over 1,000 vehicle searches on FOB Blue Diamond and Kalsu;" discovered and safely destroyed "multiple cache finds while supporting Task Force Falcon" as a K9 handler; and "planned, coordinated, and executed MWD [military

working dog] support for over 20 combat support missions." *Id.* During his 2009 tour, Joe "escorted over 2,500 personnel and 600 pieces of equipment from Kuwait SPOD to Camp Buehring for the brigade without accident or loss" and assisted in "planning, coordinating and executing over 75 ground assault convoys in Iraq." *Id.* He received the following medals, awards and accommodations as a result of his service with the Army:

- 3 Army Accommodation Medals
- Iraqi Campaign Medal/ 3 Campaign Stars (for 3 tours of combat in Iraq)
- 5 Army Achievement Medals
- 3 Army Good Conduct Medals
- Hero of the Day Award (for events of December 24, 2007, discussed below)
- Nation Defense Service Medal
- Global War on Terrorism Award/Medal
- Service Ribbon
- Overseas Ribbon
- Air Assault Badge (2)
- Driver Mechanic Badge
- Combat Life Saver Badge
- Special Reaction Team Badge
- Patrol Dog Handler Badge

*See* Dd124, *supra* and awards, attached collectively as **Ex. N.**

On December 24, 2007, Joe was deployed to Barwana, Iraq with Task Force Falcon out of Ft. Bragg. *See* VA Records, Trial Exhibit AA, at p. 5 of 547. This task force was comprised of Special Ops and Army Rangers. Joe was the K9 handler attached to this unit. He and his dog, Rocky, who was trained to detect bombs/IEDs, were on patrol with the unit on that Christmas Eve. The unit, along with Joe and Rocky, crossed a bridge to inspect a water tower and saw some crudely hidden IEDS. After observing these devices, the unit turned around, going back the same way. As the unit was crossing back over the bridge, one of the soldiers triggered an IED, blowing up the bridge. This soldier was critically injured and a lieutenant was seriously injured. Joe and the unit transported the injured to a nearby cemetery that was set up for triage. The soldier

16

ultimately succumbed to his injuries; Joe witnessed him bleed out.  Joe suffered a traumatic brain injury ("TBI") and injuries to his back and spine from this blast.

USSG §5H1.11 provides, "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  This matter is similar to *U.S. v. Johnson,* 464 F.Supp.3d 22 (DC 2020) in which Judge Kentanji Brown Jackson granted a 2 level departure pursuant to USSG §5H1.11. There, the defendant was convicted of seven (7) felony charges for receipt and possession of an unregistered firearm, unlawful making of such firearms, possession of a weapon of mass destruction, and conspiracy to smuggle goods into the U.S.  Like Joe, the defendant was an honorably discharged US Army veteran, with no prior convictions, and was diagnosed with PTSD and substance abuse issues.  Also like Joe, the defendant remained on pretrial release, while treating successfully in various treatment programs through the VA.  The Court took these factors into consideration and granted a 2 level departure.  *See* fn 4.

As outlined above, Joe served in the U.S. Army from 1999 to 2010.  He served 3 tours of combat in Iraq from 2005 through 2010.  In 2007, he was injured when an IED exploded, killing a fellow service member in front of him and seriously injuring another.  Joe suffered a traumatic brain injury for which he still suffers from migraines and tinnitus, as well as, back and neck injuries that cause chronic pain. His PTSD (discussed below) is the direct result of this incident.  It is notable that despite this, Joe went on another tour of combat in 2009.  And, served as a civilian contractor, providing security at the Baghdad Embassy, after he was discharged from the Army. His military service—which has caused significant mental health issues that contributed to his

actions in this matter—is not properly considered by the guidelines and would warrant a departure under USSG §5H1.11.

In sum, Joe has a commendable military career.  He served his country by sacrificing his mind and body.  He carries the mental and physical scars from this career and, as discussed below, these contributed to his actions on January 6th.  For this reason, Joe is respectfully requesting the Court grant his motion for departure pursuant to USSG §5H1.11.

### 3.  Criminal and Employment History

Joe has no criminal history.  In fact, he is retired from the police force.  In 2013, Joe attended and graduated from the police academy where he was class leader and Valedictorian.  He then joined the Hardin County Sheriff's Office as a Sheriff's deputy later that year.  He was a road patrol officer who conducted hundreds of arrests in his career.  He was in this position until May of 2016 when his PTSD symptoms overwhelmed him (as discussed above).  Since this time, Joe has been unable to work.  Presently, he is looking for volunteer organizations that will allow him to work within his mental and physical limits, with a focus on local animal shelters.

### 4.  Mental Health History and Motion for Departure Pursuant to USSG §§5H1.3 and/or 5K2.13

Joe moves for a departure pursuant to USSG §§5H1.3 and/or 5K2.13 for his mental incapacity/condition at the time of the offense and to allow him to continue treatment for his service-related PTSD.   As evidenced by the articles and reports cited below, as well as, a July 2, 2024 addendum report provide by Dr. Timothy Houchin, attached as **Ex. O**, Joe cannot receive the necessary mental health treatment for his service-related PTSD in custody.  For this reason, a departure is appropriate and warranted pursuant to USSG §§5H1.3 and/or 5K2.13.   In the alternative, should the Court find that Joe does not qualify for a departure pursuant to USSG

§5K2.13, he respectfully requests the Court vary based upon the factors identified, and/or to depart under USSG §5H1.3.

### a. Mental Health Diagnosis, Symptoms, and Treatment

Joe is 100% disabled, with 80% being service connected. His disability rating is as follows:

- Chronic Post Traumatic Stress Disorder (70% disabled). *Id.*[2]
- Tinnitus (10 % disabled). *Id.*
- Traumatic Brain Injury ("TBI") and Migraine Headaches (30% disabled). *Id.*
- Lumbosacral or cervical strain (10% disabled). *Id.*

The Chronic PTSD, Tinnitus, TBI and migraine diagnoses are directly related to the 2007 Christmas Eve IED explosion in Iraq. As shown by his disability rating, in addition to the horrible events that he witnessed, which led to the PTSD, Joe was physically injured in the explosion and continues to suffer with chronic physical issues as a result. Joe also suffered an injury to his back and neck during a repelling exercise in Air Assault School in 2001. *See* August 26, 2019 VA record, Trial Exhibit AA, at p. 220 of 547.

As demonstrated throughout his VA records, Joe's PTSD symptoms include, but are not limited to, flashbacks, nightmares, angry outbursts and dissociative symptoms. The following is a chart with dates and reported symptoms, taken from his VA records presented at trial:

| April 2, 2012 | flashbacks once or twice a week; "definite but transient dissociative quality; daydreaming quality" |
| May 9, 2016 | re-experiencing combat trauma |
| June 6, 2016 | Joe reports "recently had a severe flashback that impacted his behaviors over two days and prompted resumption of alcohol abuse;" "veterans trauma-based symptoms have increased, culminating in an angry (and possibly dissociative) outburst at work five weeks ago." |
| July 8, 2016 | Discussion of "symptoms of re-living include flashbacks, nightmares and extreme emotional and physical reactions to reminders of events" |
| August 19, 2016 | Discussion of "development of trauma flashbacks" |

---

[2] *See* VA records presented at trial as Exhibit AA. Joe's disability rating is found in his August 1, 2019 and August 13, 2019 VA records. These records provide the most comprehensive evaluation of his PTSD symptoms. It should be noted that the diagnoses contained in this report remain the same to date.

| September 26, 2016 | "discussed [Joe's] most recent dissociative PTSD episode which occurred last Friday;" "This marks the 2nd dissociative episode veteran reported this month." |
|---|---|
| October 24, 2016 | "in this session the veteran dissociative episodes, triggers, emotional pain regarding negative and frightening images from deployment trauma and working on appropriate coping skills." |
| May 22, 2017 | Joe "feels he is returning to the old pattern of cognitive distortion"[3] |
| August 13, 2019 | Joe reported in last month 10-15 times "re-experienced" memories when around dogs and walking through doors; nightly trauma specific dreams; daily emotional distress triggered by reminders; daily physical reactivity triggered by reminders |
| December 15, 2020 | Irritable, ruminating thoughts/actions |
| January 5, 2021 | As part of his treatment plan, reported experienced symptoms are anger, insomnia, irritability, distressing memories, feelings of responsibility |

As the Court may recall from trial, the Defendant's expert, Dr. Houchin, testified that Joe's symptoms of PTSD are flashbacks, dissociation, nightmares, hyper-arousal, and hypervigilance ("meaning he is on edge"). ECF 147 at 46:22—47:10. He further testified that disassociation occurs in 30% of patients with PTSD and occurs because individuals like Joe are trying to protect themselves from flashbacks. *Id.* at 46:25—47:4. Like Joe, "[t]hey go into a dream-like state, that is numb, similar to an anesthetic agent." *Id.* at 47:3-4. In Joe's interview with Dr. Houchin in February 2024, he advised that when having a PTSD reaction, he feels like he is "separating from reality" and that he has "been having issues at times where I can't tell if I'm dreaming or awake." Dr. Houchin February 12, 2024 Report, attached as **Ex. P.** Dr. Houchin also testified that Joe experiences survivor's guilt because "he feels guilty for being alive, frankly because they missed the bomb." *Id.* at 47:11-14. Indeed, this is reflected in his medical records. In a therapy session in September of 2020, Joe advised that he blames himself for the death and injuries to his fellow soldiers. *See* September 18, 2020 VA record. He specifically told his therapists that he feels that because he didn't do his job and find the explosive, he is the reason the soldier was killed. *Id.*

---

[3] Cognitive distortion is an exaggerated or irrational thought pattern involving the onset of perpetuation of psychopathological states, such as depression and anxiety. Cognitive distortion are thoughts that cause individuals to perceive reality inaccurately.

Before January 2021, Joe's PTSD symptoms worsened due to world events and his inability to effectively treat in 2020 (discussed below). Proof is again found in his VA records presented at trial:

| March 20, 2020 | Joe reports researching COVID 19 and can't find an obituary of anyone who has died from it. "He questions what is really going on." He believes that COVID may be a distraction from something else. |
| May 20, 2020 | Joe is reporting experiencing panic attacks |
| September 18, 2020 | Joe's survivor's guilt is strong. He has open discussions with his therapists regarding his guilt for missing the bomb and his responsibility for the soldier's death. |
| October 26, 2020 | Joe is suffering from insomnia; agitation/irritation is same. |
| December 15, 2020 | Part of presenting problem is "news binging." Joe reports "increased thoughts that the world is crumbling, feels like he needs to watch/read on his phone all the time"; "Discussed his obsessive tendencies to include only certain clothes he can wear that look a certain way and ruminating thoughts/actions" |

This is also supported through his wife's interview with Dr. Houchin. She advised Dr. Houchin that "things were especially bad in 2020" when Joe was "drinking, smoking cannabis, [and] consuming too much news." Dr. Houchin February 12, 2024 Report.

Joe's records also reflect triggers for his PTSD:

| October 17, 2019 | Joe's PTSD evaluation noted daily triggers/SUDS.[4] SUDS ratings at 70 or higher included hearing a helicopter, burning trash, military shows, watching world news, standing in line and being touched by unfamiliar people |
| January 5, 2021 | Joe is easily angered/triggered. Significant psychosocial and contextual factors: "exposure to war" |
| January 26, 2021 | Joe reports "he has recently been triggered by all the political unrest and feels that he is on the fence 'teetering' with possible outburst and inability to restrain self." |

Per Dr. Houchin, Joe's triggers include crowds, dogs, "entering through certain doors," and loud noises not of his making (a typical symptom among veterans). ECF 147 at 45:20-46:2. As to the latter, Dr. Houchin explained that with veterans with combat-related PTSD, some are fine with

---

[4] Subjective Units of Distress; what makes the patient feel anxious, angry, scared, upset, jumpy or any other negative emotional state.

  
going to the firing range because they are pulling the trigger and making the noise happen; same with setting off fireworks themselves because they know it's going to happen. *Id.* at 48:1-5. Triggers occur with combat-related PTSD veterans when "they hear a loud noise that they didn't cause…or didn't know was coming." *Id.* at 48:5-9.

Joe began behavioral treatment for PTSD symptoms in 2009 while still in the service. *See* VA records, *supra.* Once he was discharged from the military, Joe tried to deal with the symptoms as best he could. In 2012, he started seeing a therapist at the VA in Louisville, Kentucky. However, he only treated, on average, a few times a year. In 2016, things changed. In May of that year, Joe had a mental break and put a gun to his head. *See* May 12, 2016 VA record.[5] Joe was leaving the gym and had his loaded service weapon in his vehicle. He "pondered and struggled with the thought of should or should he not harm himself" and the "[f]eeling was so overwhelming that he actually scared himself." *Id.* He called the suicide hotline with the VA and immediately began treatment. Since that time, he has consistently treated every month through therapy and/or medication with the VA. From 2019 through the early part of 2020, he treated at least three times a month with the VA.

In late 2020 and early 2021, due to COVID and self-medication, Joe was not receiving adequate treatment for his PTSD symptoms. At trial, Dr. Houchin described his treatment during this time-period as follows:

> Q:      Did you have a chance to or do you have an opinion as it relates to Joe's treatment for PTSD, in late 2020 early 2021?
> A:      I do have an opinion. I think it was inadequate.
> Q:      How so?
> A:      Well many ways. So most of us remember 2020 as being very challenging. As a physician, I would submit to the Court it was an even greater challenge to those suffering from serious mental or emotional problems. Access to health care was limited often to on-

---

[5] It is unclear what precipitated this event, but he lost his brother to an overdose in 2015 and a fellow service member had recently committed suicide. It is believed that this factors heavily contributed to this break.

> screen things.   People who relied on inpatient or in-person
> psychotherapy or other medical treatments, either couldn't get them
> or they would get them on a computer screen.
>
> In Mr. Irwin's case, it was even worse, because his therapist
> died in August 2019 in a house fire.  I think he had been seeing his
> therapist for six or seven years, Mr. Burton.  So, Mr. Burton died.
> Some months later, COVID happened.  He had to start all over with
> a new therapist virtually.  And he was using alcohol and cannabis
> and not doing well.  ECF 147 at 66:16-67:10.

Dr. Houchin also testified that during this time Joe was prescribed an off-label medication that was

not FDA approved to treat PTSD.  *Id.* at 67:13-15.   Dr. Houchin reiterated his opinion in his most

recent report, writing that Joe's "mental health diagnoses were indeed in a poorly treated state on

January 6, 2021."  July 2, 2024 report at p. 5.

Joe's current mental health diagnosis is chronic PTSD with dissociative symptoms; Major

Depressive Disorder, recurrent; Alcohol Use Disorder, in early remission; Traumatic Brain Injury;

Tinnitus; and Migraine Headaches.  *See* Dr. Houchin July 2, 2024 report.

It has taken many years for Joe and his providers to create a tailored treatment plan for his

symptoms and needs.  Per Dr. Houchin, Joe's "mental health is currently well treated, and he has

made tremendous progress since January 6, 2021.   His PTSD and Depression symptoms are

present by manageable."  July 2, 2024 Report at p. 5.   Currently, Joe's treatment consists of

prescribed anti-depressant and anti-anxiety medication, as well as, Alpha-Stim treatments.  *Id.*

Alpha-Stim is an FDA-cleared device that produces electrical stimulation of the brain via the

passage of current through electrodes placed on the ears.  It helps control insomnia, anxiety and

depression and must be prescribed by a licensed health care professional.  *Id.*  Joe currently attends

individual and group therapy.  The group therapy sessions occur every Thursday for one hour and

are specifically for veterans with combat-related PTSD.  Per Joe, "[o]ther than church, the group

therapy is the most important thing to my mental health."  He advised Dr. Houchin that "They are

my lifeline…they know everything about me." July 2, 2024 Report at p. 3. Individual therapy is

provided as needed. Currently, Joe attends individual therapy, on average, 1 to 3 times per month.

Lastly, Joe attends church regularly, which "is an integral part of his mental health recovery." *Id.*

### b.    Argument for Departure

USSG §5H1.3 holds, in relevant part:

> Mental and emotional conditions may be relevant in determining
> whether a departure is warranted, if such conditions, individually or
> in combination with other offender characteristics, are present to an
> unusual degree and distinguish the case from the typical cases
> covered by the guidelines.

> In certain cases a downward departure may be appropriate to
> accomplish a specific treatment purpose.

Similarly, USSG §5K2.13 provides:

> A downward departure may be warranted if (1) the defendant
> committed the offense while suffering from a significantly reduced
> mental capacity; and (2) the significantly reduced mental capacity
> contributed substantially to the commission of the offense.
> Similarly, if a departure is warranted under this policy statement, the
> extent of the departure should reflect the extent to which the reduced
> mental capacity contributed to the commission of the offense.

With regard to a defendant's diminished capacity, as part of the Sentencing Reform Act,

Congress directed the Sentencing Commission to consider the relevance of an offender's "mental

and emotional conditions to the extent that such condition mitigates the defendant's culpability."

28 U.S.C. 994(d)(1994) and *U.S. v. Crockett,* 330 F.3d 706, 711 (6th Cir. 2003). In response, the

"Commission identified a defendant's reduced mental capacity as one circumstance in which a

departure *would be encouraged.* Such a disability, in the Commission's view '*would normally*

*warrant a downward departure*.'" *U.S. v. Leandre,* 132 F.3d 796 (D.C. 1998) (internal citations

omitted) (emphasis added). Per the D.C. Circuit:

> The departure under section 5K2.13 applies to all crimes equally and
> may be considered by the sentencing judge even if the fact-finder
> has rejected a defense of insanity or diminished capacity. As this
> court emphasized in vacating and remanding for resentencing in
> *Chatman,* the ultimate goal of section 5K2.13 "is to treat with lenity
> those individuals whose reduced mental capacity contributed to the
> offense." *Id.* at 803 (internal citations omitted).

It further explained that while it is necessary for an acquittal at trial that a defendant prove but for

his mental health, he would not have committed the offense, "[t]he plain language of section

5K2.13, permitting departures, 'to reflect the extent to which reduced mental capacity contributed

to the commission of the offense,' makes clear that the defendant's diminished capacity need be

only a contributing factor." *Id.*

Turning first to USSG §5K2.13, based upon comments by this Court during the

undersigned's closing arguments in this matter, it recognized the potential application of this

departure. While arguing specifically as to Joe's PTSD dissociative symptoms in relation to

memory, discussions occurred surrounding angry outbursts and whether Joe's PTSD could

manifest into memory issues, anger issues or both. During these discussions, the Court stated:

> I guess I am still back to the same place I was on before on this
> which is the standard for the insanity defense or lack of
> responsibility defense is extremely high and I don't understand you
> to be making that argument here. So—all of this could be, if I were
> to conclude there were grounds for a conviction, a fair argument for
> purposes of sentencing, if I got to that point. ECF 148 at 76:17-23.

The extent of the departure pursuant to USSG §5K2.13 should reflect the extent to which

the Defendant's diminished mental capacity contributed to the commission of the offense. USSG

§5K2.13. There are two ways that Joe's diminished mental capacity contributed to the

commission of the offenses of conviction. The first is Joe's decision, presence and overall actions

at the Capitol on January 6. The second is his specific actions of breaking Able and entering the

25

Capitol shortly after experiencing exposure to gas grenades and large crowds. Each of these will be addressed below.

Joe's actions on January 6, 2021 are completely out of character to the law-abiding citizen of his first 40 years of life. So, it begs the question: What was occurring in Joe's mind to lead him to his decisions and actions on January 6, 2021? His medical records and the opinion of Dr. Houchin demonstrate that his PTSD was not being properly treated and he was becoming obsessed with world events. Dr. Houchin's most recent opinion cements this position, finding that Joe's "mental health diagnoses were indeed in a poorly treated state on January 6, 2021. His [serious mental illness] therefore led to diminished capacity and to rationally contemplate his actions even before the crowds and teargas explosions acutely exacerbated his PTSD." July 2, 2024 report at p. 5. This is further evidenced through Joe's multiple text messages with his co-defendant discussing election fraud, conspiracies and reciting on-line articles and information. If Joe had been properly treated, as he is now, with medication, Alpha-stim, and individual and group therapy, he most likely would not have been so obsessed with the news, leading to a trip to D.C. Indeed, as discussed more below, in the time since January 6, 2021, Joe has made great strides in treatment and, as this Court is well aware, has not had a single violation while on pre-trial supervision. Further, unlike other January 6 defendants, Joe has not been on social media or other media platforms discussing, theorizing or debasing the government for his prosecution or continuing in a false narrative of a stolen election. This shows that with the proper treatment and control of his symptoms, Joe follows the law and does not get caught up in conspiracy theories or obsessions.

As to Joe's specific actions, and one could argue, most egregious actions, of breaking Able on the upper west terrace and then entering the Capitol—this occurred shortly after Joe was

exposed to what he believed to be flashbangs on the lower west terrace, triggering a dissociative state. Deputy Chief Lloyd testified at trial that the Capitol Police were deploying gas grenades with explosives into the crowd. Transcript of Bench Trial—Day 1 at 75:12-15. When Joe was arrested in August of 2021, before speaking with an attorney and long before going to trial in this matter, he gave a statement to FBI Agent Powers explaining his reactions to what he thought were flashbangs:[6]

- "one of the police officers threw a flash bang into the crowd and it landed right in front of us—to a guy in a green jacket, at which point, my anxiety before deployment to being a cop starts going off;"
- "It started with the flash bang—sent me, sent me over the edge for sure"
- "I-I have really bad PTSD…obviously four deployments, being a cop for a while, I've seen my share of dumb shit. When the flashbangs and stuff started going off, it definitely affected me…um, moving up, it you know, was I'm [sic] making rash decisions, was I thinking logically? You know, I was doing the best I could. And that's, that's the best I can say."

When Joe sat down with Dr. Houchin for his evaluation before trial, he described the flashbang as a bomb. Per Dr. Houchin's testimony:

> he said that is when the bomb went off. He used the word bomb. And I wrote it down. When people say something that is interesting, I put it in quotes and write down exactly what they said. He didn't say flash bang. He said it was a bomb. He later said it was a flash bang or tear gas. ECF 147 at 98:21-99:1.

Dr. Houchin opined in his written report and during his testimony that Joe suffered a PTSD-dissociative episode following his exposure to the gas grenades with explosives. *See* February 12, 2024 Report and ECF 147 at 75:1-4. Per his report, Joe "experienced a PTSD, dissociate reaction on January 6, 2021. Based upon previous history, this was likely triggered by a combination of the large crowds coupled with tear gas canisters exploding." February 12, 2024 Report at p. 9. As stated above, "dissociation is this dreamlike twilight state that certain individuals go into when

---

[6] See Trial Exhibit 513 at pp. 6, 11, and 34.

they are feeling very stressed." ECF 147 at 48:21-23. Dr. Houchin also testified that PTSD episodes "can last a long time. So they can have residual effects that sometimes last for days." ECF 147 at 115:16-17.

As the Court will recall, shortly after Joe's exposure to the explosive gas grenades, he struck the ground with his walking stick (Able), breaking it into. Dr. Houchin testified that he believed Joe suffered a dissociative episode when he broke the walking stick. *See* ECF 147 at 71:19-72:10.[7] The Court asked Dr. Houchin about this specific incident and the exchange went as follows:

> THE COURT: But, the other thing is that you have testified to that I think also shows up in the medical records is that another symptom he has of his PTSD is angry outbursts. And how do I distinguish simply an angry outburst from a dissociative event?
>
> [DR. HOUCHIN]: His medical records cites angry outburst as something that he does when he has a PTSD dissociative reaction.
>
> * * * * *
>
> THE COURT: …I am not trying to get into anything other than just whether he is responsible for the crimes that the government alleges that he committed. And I guess in doing that, I am trying to understand the medical testimony here. And understand whether you can really say, to a reasonable degree of medical certainty, that what was going on when he broke the stick was a dissociative event or episode versus an angry outburst, both of which can be associated with PTSD.
>
> [DR. HOUCHIN]: I am following you. It is a tough circle to square. I think that from a memory perspective, it fits the narrative and it makes sense. The totality of the circumstances, from my opinion is that he didn't remember how he broke the stick. I am not saying that he broke the stick because of a PTSD dissociative reaction. But he looked like he was having a PTSD dissociative reaction. When one puts the totality of circumstances together, he looked like he was having one. ECF 147 at 113:12—114:24.

[7] At trial, the issue was Joe's memory impairment as to how the stick was broken. Dr. Houchin testified that this was the result of the PTSD dissociative episode. While Dr. Houchin's testimony was limited to the memory issue, the proof is the same that Joe was suffering from a PTSD dissociative episode at the time of the stick breaking event.

In his addendum report, dated July 2, 2024, Dr. Houchin specifically opines that Joe's PTSD dissociative state "acutely diminished [his] capacity to conform his behaviors to the requirement of the law on January 6, 2021." July 2, 2024 Report at p. 4.

This evidence and testimony shows that Joe's PTSD had a direct effect on his actions of yelling and breaking the walking stick. Whether that be from a dissociative reaction or if it is an angry outburst, both are symptoms of his PTSD. Joe's felonious conduct is primarily based on his actions of breaking Able.[8] Specifically, Probation enhanced Joe's guideline range by 3 levels pursuant to USSG §2A2.4(b)(1) for Joe's possession and threatened use of a dangerous weapon because he "carried a…wooden stick, and used such in a threatening manner towards police as evidence by the Court's ruling on May 14, 2024." PSR, ECF 184 at ¶73. Joe is respectfully requesting the Court depart from that portion of the guideline enhancement that accounts for this conduct.

Candidly, pursuant to USSG §5K2.13, the Court may not depart below the applicable guideline range if it determines that the offense "involved actual violence or a serious threat of violence." To determine if the offense is a non-violent offense, the court must examine all facts and circumstances of the offense. *U.S. v. Chatman,* 986 F.2d 1446 (D.C. 1993). In *Chatman,* the Court stated:

> the term "non-violent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend. *See Poff,* 926 F.2d at 595 (Easterbrook, J., dissenting) (under section 5K2.13, "when incapacitation is not an important justification for punishment, mental condition may be the basis of a departure"). A determination regarding the dangerousness of a defendant, as manifested in the

---

[8] This is what appears to set his actions apart from the co-defendant's actions (who is only facing a misdemeanor sentence) on January 6, 2021.

particular details of a single crime that he or she has committed, is best reached through a fact-specific investigation. *Id.* at 1452.

Finding no case law out of the D.C. Circuit on this particular issue, the 9th Circuit provides a persuasive opinion for application of the departure where a defendant was charged with possessing a dangerous weapon—a firearm. *U.S. v. Cantu,* 12 F.3d 1506 (9th Cir. 1993). There, the Defendant was charged with felon in possession of a firearm after police, who were investigating the defendant about a dispute in a bar, discovered a loaded .22 in his waistband. *Id.* at 1509. Like Mr. Irwin, the defendant was a combat veteran with service-related PTSD who experienced flashbacks, nightmares, intrusive thoughts, depression, paranoia and was "explosive at times." *Id.* at 1513. The Court found that the defendant's PTSD was a "grave affliction" that affected his mental processes. *Id.* Like Dr. Houchin, the defendant's expert opined that his mental health condition interfered substantially with his ability to make reasoned decisions, "causing him to fixate on weapons and rely on them for feelings of personal safety and security." *Id.* Despite the conviction being for weapon possession and the defendant, like Mr. Irwin, suffered from alcohol abuse, the Court found that a departure was warranted under §5K2.13. That is, possessing a weapon was not a violent crime and, even though he had an alcohol addiction, it did not reduce his mental capacity.

Should the Court determine that Joe's mental health issues at the time of offense do not rise to the level necessary for a departure under USSG §5K2.13 or that one of the exceptions apply, there is enough proof present to warrant a variance based upon the policies underlying USSG §5K2.13. Alternatively, a departure pursuant to USSG §5H1.3 would be appropriate to accomplish a specific treatment need. Here, that would be a departure of 2 levels so Joe could serve his sentence on home detention, allowing him to continue with his medical and therapy treatment with

the VA and church.  As discussed below, the level, extent and type of treatment needed cannot be provided by the BOP.

### B.  Need for Correctional Treatment and Protection of Public (18 U.S.C. §3553(a)(2))

To best protect the public, Joe needs to maintain consistent treatment for his PTSD and other mental health issues.  The question is, then, whether treatment is best provided in custody or out of custody.  Here, the answer is out-of-custody individual and group therapy.

The U.S. Probation Office provided a list of potential programs available for Joe in custody. *See* DN 184 at ¶157.  There are two issues with this programming.  First, as emphasized above, Joe is in individual and group therapy focused specifically on combat-related PTSD.  Of the programming researched and recommended by Probation, only one focuses on PTSD and it is not combat-related.  Second, while programing may be available and recommended by the Court, there is no guarantee that Joe will go to a facility that offers these programs or that the BOP would correctly classify Joe for mental health treatment.  A 2018 report by the Marshall Project found, after obtaining and analyzing data obtained through a Freedom of Information Act request from the BOP, that the bureau had lowered the number of inmates designated for higher mental health care levels by 35% after it issued new internal guidance in May 2014.[9]  *See Treatment Denied: The Mental Health Crisis in Federal Prisons,* November 21, 2018.[10]  Per the U.S. Department of Justice Office of the Inspector General, this reduction occurred because the BOP did not have the mental health staff necessary to meet the 2018 policy's increased treatment standards.  *DOJ OIG Release Report on the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with*

---

[9] This appears to be the most recent BOP policy for mental health treatment.
[10] This report can be found online at https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons.

*Mental Illness.*[11]  As of February 2018, the BOP classified just 3% of inmates as having a mental

illness serious enough to require regular treatment.  *Id.*  A 2023 article from the Minnesota Journal

of Law & Inequality cited to studies finding that 50% of individuals incarcerated in state and

federal prisons were not given access to previously prescribed psychiatric medication.  *"It's*

*Absolutely Immoral": The Denial of Mental Health Treatment in U.S. Prisons,* Nicole Carter,

January 9, 2023.[12]  This article further stated that "individuals with diagnosed mental illnesses

living in federal prisons 'are lucky to get even one hour of mental health treatment a month.'  *Id.*

A 2002 report by The Sentencing Project similarly found:

> Correctional facilities are poor settings for providing mental health
> care.  The earliest possible diversion of individuals to the
> community or to residential treatment services is generally in the
> best interest of all concerned.  Community based treatment and case
> management services are more likely than jail admissions to
> stabilize individuals and reduce recidivism.  *Mentally Ill Offenders*
> *in the Criminal Justice System:  An Analysis and Prescription,* The
> Sentencing Project, January 2002 at p.18.[13]

Dr. Houchin opined that the BOP would not be equipped to provide Joe with adequate

treatment for his mental health.  July 2, 2024 Report at p. 6.  Specifically, he found that the BOP

could not provide a group therapy session comprised of veterans with combat-related PTSD.

Group therapy with individuals with this background "provides a therapeutic environment that is

especially conducive to combat-related PTSD recovery."  *Id.*  Probation's report does not provide

that group sessions with veterans suffering from combat-related PTSD are available in the BOP.

Likewise, VMAC psychotherapists, like the one that Joe sees individually, "are uniquely trained

---

[11] This report can be found online at https://oig.justice.gov/news/doj-oig-releases-report-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness
[12] This article can be found online at https://www.lawandinequality.org/2023/01/09/its-absolutely-immoral-the-denial-of-mental-health-treatment-in-u-s-prisons/
[13] This report can be found online at https://www.sentencingproject.org/wp-content/uploads/2016/01/Mentally-Ill-Offenders-in-the-Criminal-Justice-Sytem.pdf.

and suited for providing combat-related PTSD individual therapy." *Id.* There is no indication from Probation's report that the BOP employs therapists trained in this matter. Joe needs both oral medication and Alpha-stim treatment. Probation's report is silent regarding the latter treatment and Dr. Houchin has yet to confirm if the BOP can provide Alpha-stim treatment to Joe. *Id.* Lastly, Joe's ability to attend church with those he trusts in his community cannot be mimicked in the BOP. Dr. Houchin opined that "[a]lthough church may not be considered a formal mental health treatment, the biopsychosocial model is well-recognized and one's regular attendance and meaningful participation in religious activities is demonstrated to improve mental health outcomes." *Id.*

### C. Nature and Circumstances of the Offense and Motion for Variance Based Thereon, Seriousness of the Offense, and Just Punishment (18 U.S.C. §3553(a)(1)

Candidly, there are aggravating factors concerning the nature and circumstances of the offense. Indeed, it appears that Probation's recommendation centers on this one factor and those aggravating circumstances. DN 185. The first three paragraphs of Probation's recommendation outlines Joe's history and characteristics, which, as argued above, are mitigating factors supporting a probated sentence. Accordingly, it appears that Probation's recommendation is centered on the communications between Joe and his co-defendant and the actions of Joe on January 6, 2021. Likewise, the U.S.'s sentencing memo is almost entirely devoted to the facts of the offense. 20 pages of the sentencing memo recites the facts of the offense. ECF 186 at pp. 2-22.

Joe refers the Court to his arguments in section VI(4) above regarding his mindset and the effect of his mental illness on his actions that day as mitigating evidence regarding his actions on January 6, 2021. Further, there was no evidence presented at trial that Joe struck or pushed an officer; used an object on an officer (i.e. a weapon, pepper spray); damaged property in the Capitol; or took any property from the Capitol. Likewise, there is no evidence that Joe encouraged others

to act aggressively, to harm officers, or to damage or take property.  True, he did yell and chant, but he did not direct anyone to take any violent actions.  For example, he did not yell at others to push the line against the police, to strike the police, to spray pepper spray or to break property.

When the mitigating and aggravating factors of Joe's actions on January 6, 2021 are weighed, they do not support the sentence recommended by Probation.  Instead, using the guidelines as a starting point and then considering this 3553(a) factor, a sentence of probation with 12 months home detention is appropriate and reasonable.  This is especially true when the Court considers the remaining 3553(a) factors.

### D. Respect for the Law, Deterrence of Criminal Conduct, and Protection of the Public(18 U.S.C. §3553(a)(2))

Joe has been on release under the supervision of pretrial services for almost 3 ½ years.  During this time, he has not violated any of the conditions of his release.  This demonstrates that being placed on supervision, alone, promotes Joe's respect for the law and deters him from criminal conduct.  That is, a sentence of incarceration would not better accomplish deterrence or respect than one of supervision.

Recidivism rates for zero-point offenders, i.e. defendants with no criminal record, are low.  In 2021, the U.S. Sentencing Commission issued a report analyzing the recidivism data for federal offenders.  *See* U.S. Sentencing Commission, Recidivism of Federal Offenders Released in 2010 (2021).[14]  This report concluded that zero-point offenders were less likely to be rearrested than "one-point" offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same Criminal History Category.  *Id.*  Thus, Joe's lack of past criminal record further supports that he is predisposed to be less likely to commit further crimes.  In turn,

---

[14] The Report is available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

supervision rather than imprisonment would be appropriate for a similarly situated defendant with no criminal disposition.

### E.      The Type of Sentences Available (18 U.S.C. §3553(a)(3))

Should the court grant Joe's motion for variance, his offense level would be 11. As applied to a Criminal History Category I, his guideline range is 8 to 14 months, falling in Zone B of the guidelines. For Zero-Point offenders like Joe, a sentence other than imprisonment is appropriate per the commentary at USSG §5C1.1. It provides:

> **(A) Zero-Point Offenders in Zones A and B of the Sentencing Table.**—If the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. USSG §5C1.1, application note 10(A).

Subsection (c)(3) of USSG §5C1.1 provides for a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement or home detention for imprisonment. While Joe is not eligible for a zero point offender reduction, the same sentence can be accomplished as contemplated by USSG §5C1.1 by placing him on probation with the condition of home detention.

If the Court were to sentence Joe as requested, his sentence would be longer than that recommended by Probation. If the Court followed the U.S. Probation Office's recommendation and sentence Joe to 12 months in custody with 2 years of supervised release to follow, the total sentence would be 36 months/3 years. However, if the Court were to sentence Joe as requested, he would be on probation for a five year time period—two years longer. This would mean two more years of deterrence and protection of the public. Further, if Joe were to violate the conditions

of his probation, he would face his original sentence, as opposed to a guideline range under USSG §7B1.4 for violation of supervised release.

### F.    The Need To Avoid Unwarranted Sentence Disparities Among Defendants (18 U.S.C. §3553(a)(6)).

#### 1.    JSIN Data

According to the Judiciary Sentencing Information ("JSIN") data, in the last five fiscal years, 164 defendants were sentenced under USSG §2A2.4 with a final offense level of 13 and criminal history category I. 15% of those defendants received a probated sentence. The rest of the defendants received an average sentence of 11 months incarceration and a median sentence of 12 months. For those defendants under the same guideline with a final offense level of 11 and criminal history category I, the average and median sentence was 8 months. Notably, 24% of those defendants received a probated sentence. There is no data available regarding departures for mental health issues and whether those who were probated suffered from mental illness and, like Joe, needed treatment for same. For this reason, if the Court sentenced Joe as requested, it would not create a sentencing disparity.

#### 2.    Other Similarly Situated January 6 Defendants[15]

The U.S. cites to the sentences of two other defendants in the Senate Chamber—Jacob Chansley, a.k.a. the QAnon Shaman, and Joshua Black. Chansley is basically the poster child for the January 6 events. He is featured in the majority of news outlets reporting the events. Further, his actions were more violent and disruptive, warranting the sentence he received. As outlined in the U.S.'s sentencing memorandum, his guideline range was 41 to 51 months. *See U.S. v. Chansley,* 1:21-cr-0003(RCL), ECF 81 at p. 15. The U.S. did not argue for an upward departure,

---

[15] This section addresses defendants whose actions were similar to Joe's on January 6, 2021. To counsel's knowledge, however, none of these defendants suffer from PTSD or were given departures for mental health issues.

but requested a sentence at the high end of the guidelines of 51 months. Judge Lambreth, however, sentenced him to the low-end of the guidelines, 41 months. For Joshua Black, the U.S. requested a 60 month sentence. *See U.S. v. Black,* 1:21-cr-127-ABJ, ECF 89. This was based upon his conduct, which was more serious and violent that Joe's conduct. Black had a knife with a 3" blade on his person; was "the first to breach the Lower West Terrace barricade;" re-positioned himself at the south-end of the Lower West Terrace and was "face-to-face with police officers and was pushed into a line of officers; Black was struck in the left cheek by munition;[16] he attempted to access a laptop and rifled through papers in the Senate Chamber, seizing "one of the documents— Sen. Cruz and Rep. Paul Gosar's objection to the certification of the Electoral College count vote for the State of Arizona—and photographed it;" he posed for photos on the dais; and "splayed himself out on the floor the Chamber." *Id.*

Notably, the U.S. does not discuss this Court's sentence for Paul Hodgkins, who was also in the Senate Chamber and carrying a flagpole with an American flag (discussed below).

The following defendants and their actions and locations are similar to Joe's on January 6, 2021:

- Dillon Homol, 1:23-cr-00050-JMC: Found guilty of Entering or Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Disorderly Conduct in a Capitol Building; Parading, Demonstrating, or Picketing in a Capitol Building. The U.S. Probation Office calculated the defendant's guideline range of 8 to 14 months. ECF 98 at p. 19. The government recommended 24 months imprisonment because the Defendant (1) prepared for violence by bringing a PVC flagpole and wore body armor; (2) observed numerous acts of violence against officers; (3) was

---

[16] Per Officer Lloyd's testimony at this trial, the aggressors in the crowd were targeted with non-lethal munitions.

present "at the very front of the mob on the West Plaza, including being one of the first rioters to break through the police line just prior to the line's complete collapse;" (4) yelling at officers, and "physically fighting with an officer over his flagpole in the Rotunda;" (5) continued to try to re-enter the Capitol "after already being one of the last rioters to be ejected from that portion of the building;" and (6) provided "less than forthright admissions" during FBI interview and bench trial concerning entry into the Capitol and participation in riot. ECF 98. Mr. Homol was sentenced to 24 months probation with a condition of 90 days home detention. ECF 105.

- Jonathan Sanders, 1:21-cr-384-CJN: Pled guilty to Picketing, Demonstrating, Parading in a Capitol Building. Mr. Sanders entered the Capitol building at 2:50 p.m. and walked around the Rotunda and Statutory Hall. He had a walking stick and was wearing a military vest. He did not destroy property or commit acts of violence. ECF 27 and 31. Mr. Sanders was sentenced to 36 months probation, 60 hours of community service and $500 in restitution. ECF 36.

- Israel Tutrow, 1:21-cr-310-ABJ: pled guilty to Picketing, Demonstrating, Parading in a Capitol Building. Mr. Tutrow admitted to entering the Capitol building and being armed with a knife. ECF 37 and 43. He was also wearing a body-armor vest. Mr. Tutrow was sentenced to 36 months probation with a condition of 2 months of home detention, and $500 in restitution. ECF 59.

- Anthony Mariotto, 1:21-CR-94-RBW: pled guilty to Picketing, Demonstrating, Parading in a Capitol Building. ECF 37. Mr. Mariotto, like Joe, was dressed in normal clothing; he was not wearing riot gear. ECF 32 & 38. His behavior, however, was more serious than Joe's; along Mr. Mariotto's route to the Senate Gallery and after leaving, he attempted to

open four (4) closed (and locked) doors while yelling "where are the traitors?" *Id.* Once
he got to the Senate Gallery, Mr. Mariotto took a selfie and posted it to Facebook with the
caption "I'm in And there are just a few [sic] This is our house." *Id.* It should be noted
that while Joe took selfies, he did not post these to Facebook or any other forms of social
media. Like Joe, Mr. Mariotto chanted. He chanted "defend your liberty, defend your
constitution." *Id.* Like Joe, he cooperated with the FBI by providing a statement and access
to his phone. *Id.* Both men entered the Senate Chamber, just at different levels—Joe on
the bottom and Mr. Mariotto on the top. Mr. Mariotto received 36 months-probation, 250
hours of community service, $5,000 fine and $500 in restitution. ECF 39.

- Paul Hodgkins, 1:21-cr-188-RDM: pled guilty to Obstruction of an Official Proceeding.
  Mr. Hodgkins made his way to the Senate Chamber and had a backpack with eye goggles,
  rope and latex gloves. ECF 32. He was carrying a flagpole and flag and took a selfie while
  in the chamber. *Id.* He also stood on the dais, participated in the Q Anon Shaman's prayer,
  and "saluted others who were shouting and cheering." *Id.* Mr. Hodgkin's guideline range
  was 15 to 21 months (Offense level 14 and criminal history I). Probation recommended
  18 months to serve. ECF 32. Per the sentencing memorandums filed in that matter, Mr.
  Hodgkins does not suffer from a mental illness and no departure was requested based
  thereon. This Court sentenced Mr. Hodgkins to 8 months to serve in custody followed by
  24 months of supervised release. ECF 37.

Thus, if this Court were to sentence Joe as requested, it would not create a disparity among
similarly situated offenders from January 6.

## VI. CONCLUSION

Using the guidelines as a starting point and applying the 18 U.S.C. §3553(a) factors, the requested sentence would be sufficient but not greater than necessary. For the foregoing reasons, Joe requests the Court sentence him to probation with the condition of 12 months home detention. This would allow Joe to continue to treat with the VA in the individualized and specifically tailored treatment regimen that is crucial to his mental health. Home detention would allow him to continue to care for his children and provide financial stability so the family can keep their home. It would also be appropriate for a zero-point offender, like Joe, with no criminal record. Such a sentence would place Joe under supervision longer than what is recommended by Probation, ensuring that Joe would stay compliant with treatment which, in turn, will protect the public and deter Joe from future criminal conduct. Joe respectfully requests the Court consider all these factors under 18 U.S.C. §3553(a) and not to focus solely on his worst day—the only criminal conviction of his life—January 6, 2021.

/s/ Chastity R. Beyl
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, Kentucky 40202
(502) 584-0525

Counsel for Defendant.

## CERTIFICATE

I hereby certify that on December 17, 2024, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the attorneys of record.

/s/ Chastity R. Beyl